[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-13824

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 27, 2006
THOMAS K. KAHN
CLERK

D. C. Docket Nos. 04-03595-CV-WBH-1 & 00-68309 BKC-WH


In Re:     PONY EXPRESS DELIVERY SERVICES, INC.,
           FLEET ACQUISITION CORP., and
           COURIER EXPRESS, INC.,

                                        Debtors,
_____

ANDREINI & COMPANY,

                                        Plaintiff-Appellant,


versus


PONY EXPRESS DELIVERY SERVICES,
COURIER EXPRESS, INC.,

                                        Defendants-Appellees.
                    _____

            Appeal from the United States District Court
               for the Northern District of Georgia
                    _____

                    **(February 27, 2006)**

Before BLACK, HULL and FARRIS[*], Circuit Judges.

FARRIS, Circuit Judge:

Andreini & Company appeals the bankruptcy court's grant of summary judgment, as affirmed by the district court, holding that Andreini was the initial transferee under 11 U.S.C. § 550 of a $310,422 wire transfer from Pony Express Delivery Services. As part of their insurance brokerage relationship, Pony Express wrote a check to Andreini's client trust account to cover insurance premiums owed to its insurance carriers. Andreini then paid these premiums with several checks from the trust account to the insurance carriers, but did so before the check written by Pony Express cleared its bank. Pony Express' check was returned twice for insufficient funds. Pony Express thereafter arranged a wire transfer to replace the check. We conclude that Andreini was not the initial transferee of the wire transfer, reverse, and remand to the district court.

## I

Andreini is a California insurance broker who arranges insurance coverage for its clients and bills them for the premiums due on these policies. Those payments are deposited in a client trust account, as required by California law.

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

These client trust funds are then remitted to the insurance carriers as payment for Andreini's client's insurance policies, less a commission for its brokerage services. Pony Express contracted with Andreini for insurance brokerage services with respect to its workers compensation and cargo insurance needs.

From January through March of 2000 Andreini sent Pony Express several invoices for premiums due on its workers compensation insurance polices. The various premiums invoiced were due to the insurance carriers by May 18, 2000 and June 1, 2000. The total amount of the invoices was $310,422. On May 22, 2000 Andreini received from Pony Express a check for the full amount, which it deposited into its client trust account. The following day, Andreini issued several checks from its client trust account to Pony Express' insurance carriers in payment of the insurance premiums that were now either overdue or due in one week.[1] Unbeknownst to Andreini, Pony Express was in serious financial difficulty and its check was returned for insufficient funds. Pony Express had never before given Andreini an insufficient funds check. On June 2, Andreini re-deposited the check, but it was again returned.

---

[1]In addition to these immediate payments, Andreini remitted $8,783 to a Pony Express insurance carrier after the wire transfer at issue, and after Pony Express filed for bankruptcy. Because these funds are not at issue, the net sum in dispute on this appeal is $301,639. Andreini was also paid an $11,325.30 commission not subject to dispute.

Andreini executives contacted Pony Express about the returned check and the deficiency created in the client trust account when the check bounced. To erase the deficiency, Pony Express' Director of Financial Reporting immediately authorized a wire transfer of the full amount of the check directly into Andreini's client trust account. On June 12, 2000 the $310,422 wire transfer was made.

Two days later, June 14, 2000, Pony Express filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. As part of its bankruptcy petition, on May 31, 2002 Pony Express filed a complaint in the Northern District of Georgia Bankruptcy Court against Andreini (and other defendants not party to this appeal) seeking to recover several payments, including the wire transfer, as avoidable preferences under 11 U.S.C. § 547. Pony express claimed that, if avoidable under § 547, the wire transfer could be recovered from Andreini because Andreini was the initial transferee of the avoidable preference under 11 U.S.C. § 550. Pony Express moved for summary judgment before the bankruptcy court, which granted the motion on July 26, 2004, concluding that the wire transfer was an avoidable preference and that Andreini was the initial transferee. On appeal, the District Court for the Northern District of Georgia affirmed.

**II**

We review a grant of summary judgment de novo. *See In re Optical Techs., Inc.*, 246 F.3d 1332, 1334-35 (11th Cir. 2001). Federal Rule of Civil Procedure 56 governing summary judgment applies in an adversary bankruptcy proceeding. Fed. R. Bankr. P. 7056. Under this familiar standard, the court must view the facts and make all reasonable inferences in favor of the nonmoving party. *Loren v. Sasser*, 309 F.3d 1296, 1301-02 (11th Cir. 2002).

Under 11 U.S.C. § 547 certain transfers of assets made by a bankrupt company in the 90 days prior to filing a Chapter 11 petition can be declared avoidable preferences. *See* 11 U.S.C. § 547. The bankruptcy court found that the wire transfer to Andreini's client trust account two days before Pony Express filed for bankruptcy was an avoidable preference, a finding that is not challenged. However, under 11 U.S.C. § 550, an avoidable transfer of assets can only be recovered from certain parties, including the "initial transferee." 11 U.S.C § 550(a)(1). Whether, as the bankruptcy court and district court concluded, Andreini was the initial transferee of the wire transfer is in dispute. To resolve this issue, the pivotal question is whether Andreini was a mere conduit for funds earmarked for payment of insurance premiums or whether a debt was created by Andreini's unintentional prepayment of insurance premiums such that it had legal control over funds transferred to satisfy the debt. The record indicates that the

5

wire transfer was not repayment of a genuine debt but was intended simply as payment of insurance premiums and made to a trust account.

The term "initial transferee" is a term of art whose meaning in any given transaction is not always straightforward. *See In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 705 (11th Cir. 2005).  Most circuit courts to have considered the issue, including the Eleventh Circuit, have adopted a "control" or "conduit" test to determine whether the recipient of an avoidable transfer of assets is the initial transferee.  *See id*; *see also Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988); *In re Columbia Data Prods., Inc.*, 892 F.2d 26, 28 (4th Cir. 1989); *In re Bullion Reserve of N. Am.*, 922 F.2d 544, 548-49 (9th Cir. 1991); *In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d 712, 722 (6th Cir.1992); *In re Coutee*, 984 F.2d 138, 140-41 (5th Cir. 1993); *In re First Sec. Mortgage Co.*, 33 F.3d 42, 44 (10th Cir. 1994); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 58 (2d Cir. 1997).  Under this test, a recipient of an avoidable transfer is an initial transferee only if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes, and not if they merely served as a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee.  *See Nordberg v. Societe General* (*In re Chase & Sanborn Corp.*), 848 F.2d 1196,

6

1199-1200 (11th Cir. 1988); *Nordberg v. Arab Banking Corp.* (*In re Chase & Sanborn Corp.*), 904 F.2d 588, 599, 599 n.26 (11th Cir. 1990); *Bonded Fin. Serv.*, 838 F.2d at 893; *In re Ogden*, 314 F.3d 1190, 1202, 1204 (10th Cir. 2002).

This test takes on special significance where the recipients of avoidable transfers are agents or fiduciaries of the debtor-transferor, such as banks or, in this case, insurance brokers, who are duty-bound to take only limited actions with respect to the funds received. *See, e.g., Societe General*, 848 F.2d at 1200 (finding that debtor's bank was not an initial transferee); *Ogden*, 314 F.3d at 1202 (finding that an escrow agent was not an initial transferee); *Bonded Fin. Serv.*, 838 F.2d at 893 (bank); *In re Ala. State Fair Auth.*, 232 B.R. 252, 271-72 (N.D. Ala. 1999) (finding that an insurance broker was not an initial transferee). Often these fiduciaries or agents are not considered initial transferees because their legal control over the assets received is circumscribed by their legal duties to their clients. *See Societe General*, 848 F.2d at 1200 (contrasting, for the purposes of determining whether a bank was an initial transferee, a bank's receipt of funds for the sole purpose of depositing them in a customer's account with the receipt of funds earmarked for the payment of a debt owed to the bank); *Ogden*, 314 F.3d at 1202 (finding that an escrow agent was not an initial transferee where funds received were intended for a trust account); *Bonded Fin. Serv.*, 838 F.2d at 893

7

("[W]e think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded."); *Ala. State Fair Auth.*, 232 B.R. at 271-72 (finding that an insurance broker who held a debtor's assets in trust for payment to insurance companies was not an initial transferee). This can be true even where the transferred assets ultimately come under the agent's or fiduciary's full control through a subsequent transfer. *See Bonded Fin. Serv.*, 838 F.2d at 893 (finding that a bank became a mediate, but not initial, transferee only after the debtor-transferor directed it to apply funds initially transferred to the debtor's account toward repayment of a loan from the bank).

However, even entities that have special legal relationships with the debtor-transferor can be initial transferees when they do, in fact, take legal control of an avoidable transfer; for example when they receive assets directly from the debtor-transferor as compensation for services or in payment of a genuine debt. *See, e.g., Arab Banking*, 904 F.2d at 599-600 (finding that a bank was the initial transferee of funds transferred for the express purpose of paying off loan principal owed to the bank). In these situations, the fiduciary or agent does exercise legal control over the transferred assets because they immediately become its own assets and

are not simply held for its client's purposes. *See id.* Where a fiduciary, agent, or other entity with legal obligations to the debtor-transferor is the recipient of an avoidable transfer, the control test turns on the recipient's legal rights and obligations toward the transferred assets, not simply their legal relationship with the debtor-transferor or the ultimate use of the assets. To ascertain these rights and obligations, and decide whether such a recipient is an initial transferee under 11 U.S.C. § 550, courts must look at all the circumstances of the transaction that resulted in the avoidable transfer. *See Societe General*, 848 F.2d at 1199; *Bonded Fin. Serv.*, 838 F.2d at 893.

The bankruptcy court and the district court concluded that Andreini was the initial transferee because the wire transfer was made to satisfy a debt Pony Express owed to Andreini. The courts reasoned as follows: Andreini paid the premiums due on Pony Express' insurance policies before the latter's check to Andreini had been honored. When that check was returned for insufficient funds, Andreini became a creditor to Pony Express in the amount of the premiums advanced. Since the subsequent wire transfer repaid funds Andreini had already advanced from its client trust account, the courts concluded that the wire transfer was not a payment of insurance premiums, assets over which Andreini would have had only limited legal control due to its fiduciary responsibilities as an insurance broker,

9

but was the repayment of a debt, over which Andreini necessarily exercised legal control.

The courts rightly concluded that, under the control test, the initial transferee question turns on whether a debt existed for the purposes of 11 U.S.C. § 550. If Andreini became a creditor, it was the initial transferee since the wire transfer reimbursed it for its own expenses rather than transmitting money that Andreini was obligated to pass to a third party. In the language of the control test, Andreini would have had legal control over the assets and could use them for its own purposes. This interpretation has some initial appeal, but it does not stand up to closer inspection under the control test precedent of this and other circuits.

The control test "is a very flexible, pragmatic one; . . . courts must look beyond the particular transfers in question to the entire circumstance of the transactions." *Societe General*, 848 F.2d at 1199 (internal quotation and citation omitted). The court must "step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable. This approach is consistent with the equitable concepts underlying bankruptcy law." *Id*. In *Societe General* this Court considered a situation where a bank honored a check drawn on the debtor's account in advance of receiving funds from the debtor sufficient to cover the draft, thus creating an overdraft in the debtor's account. *See id*. at 1197-

10

98. Despite the facial appearance that this overdraft created a debt, the court found that no debt existed between the debtor and the bank for the purposes of 11 U.S.C. § 550. *Id*. at 1200-01. Looking at the relevant transaction as a whole, and not narrowly at the asset transfer that ultimately erased the overdraft, the court found that the transfer was effectively a deposit to the debtor's account from which the bank paid a check drawn on that account, despite the fact that the bank honored the check *before* receiving sufficient funds from the debtor. *Id.* at 1201. For simply receiving a deposit to a customer account, rather than receiving funds in payment of a genuine debt, the bank could not be considered the initial transferee. *Id*.

The *Societe General* court relied on several facts in reaching its decision. The bank honored the check (creating the overdraft) because it was certain the funds would arrive, based on routine communications with the bank from which the debtor's transfer was originating. *Id*. In addition, the bank did not charge the debtor any interest on the overdraft, only fees that reflected the actual costs incurred. *Id*. Together these facts indicated that the bank did not view itself as a creditor in the transaction. *Id*. The court also noted that the funds transferred by the debtor were "expressly earmarked" to be credited to the debtor's account, not to satisfy a debt owed to the bank. *Id*.; *see also Arab Banking*, 904 F.2d at 599

11

(finding the debtor's instructions with respect to transferred funds persuasive). Finally, the court considered it significant that the overdraft existed on paper for only two days before the transfer of funds balanced the debtor's account. *Id*.

In all critical respects Andreini is in the same position as the bank in *Societe General*. First, Andreini did not intend to become a creditor when it sent checks to the insurance carriers. It was Andreini's general policy to immediately pay insurance premiums that were due, without waiting for its clients' checks to clear, so that insurance coverage would not lapse. The deficiency created in the client trust account when Pony Express' check was returned for insufficient funds was, therefore, inadvertent. Second, as in *Societe General*, Andreini had every expectation that the actual funds the check was drawn upon would be immediately forthcoming; in its course of dealings with Pony Express all payments by check had been promptly honored and Andreini had no knowledge of Pony Express' financial difficulties at the time it paid its insurance premiums. Third, Andreini charged no interest, or even any additional fees, for its "loan" to Pony Express, even though the deficiency in the client trust account existed for a longer period of time than in *Societe General*.

The evidence also indicates that the purpose of the wire transfer was to replace the bad check and reimburse the client trust account with funds for

12

payment of insurance premiums. Thus, as in *Societe General*, the avoidable transfer was "earmarked" not as payment of a debt, but as a deposit to a client account held in trust by the client's fiduciary. Finally, while the deficiency existed for longer than in *Societe General*, about three weeks instead of two days, the length of this period should not have dispositive significance. *See Ogden*, 314 F.3d at 1194, 1203-05 (finding that no debt was created and an escrow agent was not the initial transferee of funds transferred to replace those released four to six weeks earlier due to the debtor's fraud). More important to the control test, an inadvertent and temporary deficiency settled with a reasonably prompt wire transfer further indicates that Andreini was merely a conduit for Pony Express' insurance premiums. *See Societe General*, 848 F.2d at 1201.

In addition, the actual destination of the wire transfer is significant to determining whether a recipient has sufficient legal control over transferred funds. *See Coutee*, 984 F.2d at 141 (finding that a law firm was not an initial transferee where "the funds were deposited into the firm's trust account, as opposed to its business account, indicating that they were held merely in a fiduciary capacity."). At no time were the transferred funds under the unrestricted legal control of Andreini. The funds were wired directly to Andreini's client trust account over which its control was quite limited. Under California law the client account was a

trust account with Andreini as fiduciary such that client funds could only be used for the client's purposes, such as paying insurance premiums. *See* Cal. Ins. Code §§ 1733-1734. While Andreini is permitted to commingle "such additional funds as [it] may deem prudent for the purpose of advancing premiums . . . or for such contingencies as may arise in [its] business of receiving and transmitting premium . . . funds," nothing in the record even suggests that Andreini actually commingled its own funds with the client trust account or advanced the premium payments out of such commingled funds.[2] *Id*. The wire transfer directly into the trust account replaced client funds and not Andreini's own assets. As with all assets in this account Andreini was a fiduciary and had only limited legal control over the wire transfer. Without legal control to the extent that Andreini could put the assets to its own purposes, it is not the initial transferee. *See Ogden*, 314 F.3d at 1203-05 (finding that an escrow agent is not an initial transferee of funds even though the transfer to the escrow account was to replace funds that the debtor fraudulently induced the escrow agent into releasing); *Finley, Kumble*, 130 F.3d at 59 ("[W]e need only hold that a commercial entity that, in the ordinary course of its business, acts as a mere conduit for funds and performs that role consistent with its contractual undertaking in respect of the challenged transaction, is not an initial

---

[2]The lack of evidence on this point was acknowledged by both parties at oral argument.

14

transferee within the meaning of § 550(a)(1).”); *Societe General*, 848 F.2d at 1200-01.  This conclusion is consistent with the court's role of doing equity in bankruptcy proceedings.  *See Bonded Fin. Serv.*, 838 F.2d at 893 (noting, while finding that a bank was not an initial transferee, that it was “a financial intermediary” and “received no benefit” with respect to the avoidable transfer).  Although preference actions are available in bankruptcy proceedings to ensure that favored creditors do not benefit at the expense of other creditors, Andreini is not in that position.  The wire transferred funds were intended for, and have only benefitted, Pony Express’ insurance carriers.

Based on this court's precedent and the facts in the record no genuine debt was created for the purposes of 11 U.S.C. § 550.  Andreini did not exercise legal control over the wire transfer and is not the initial transferee under 11 U.S.C. § 550.  We reverse and remand to the district court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

HULL, Circuit Judge, dissenting:

I agree with the bankruptcy court and district court that Andreini was the initial transferee of the Pony transferred funds under 11 U.S.C. § 550 because Andreini advanced Pony's premiums to the insurers more than three weeks before the transfer; Andreini advanced the premiums before waiting for Pony's check to clear, thereby extending credit to Pony; there were no premiums due to the insurers at the time of the transfer; Andreini no longer had any obligation to forward the transferred funds to the insurers and did not; and thus Andreini exercised control and dominion over the transferred funds when it used them to repay Pony's debt to Andreini. Further, in my view, Andreini is in a materially different position than the bank in Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196 (11th Cir. 1988) because (1) three weeks passed between Andreini's premium payment and Pony's transfer, and the transaction was not "effectively simultaneous," and (2) Andreini did not "know with absolute certainty" that Pony was wiring money to cover the premiums at the time Andreini paid them; rather, Andreini automatically paid the premiums with no assurance of payment from Pony and had Pony's check returned for insufficient funds twice before being repaid three weeks later. See id. at 1201. Because I would affirm in this case, I respectfully dissent.

16