[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 29, 2010
JOHN LEY
CLERK

_____

No. 09-14997

_____

D. C. Docket No. 09-00703-CV-T-30
BKCY No. 08-00002-MP-MGW

IN RE:

BILLY JASON HARWELL

Debtor.

--------------------------------------------------------------------------------

LYNN H. MARTINEZ,

Plaintiff-Appellant,

versus

STEVEN D. HUTTON,
STEVEN D. HUTTON,
P.L.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 29, 2010)

Before HULL and MARCUS, Circuit Judges, and COOKE,[*] District Judge.

HULL, Circuit Judge:

In this fraudulent transfer case, Appellant Lynn H. Martinez ("Martinez"), as United States Bankruptcy Trustee, appeals the district court's affirmance of the bankruptcy court's grant of summary judgment in favor of Appellees Steven D. Hutton and his law firm, Steven D. Hutton, P.L. ("Hutton"). For the purposes of its summary judgment ruling, the bankruptcy court assumed that attorney Hutton had schemed with debtor Billy Jason Harwell ("Harwell") to have the debtor's funds placed in Hutton's trust account and then distributed to Harwell personally, his family members, and selected creditors.

Despite Hutton's being involved in, and the mastermind of, the debtor Harwell's fraudulent transfer scheme, the bankruptcy court concluded that Trustee Martinez could not recover the funds from attorney Hutton because he was not the "initial transferee" under 11 U.S.C. § 550(a)(1). After review and oral argument, we reverse.

## I. FACTUAL BACKGROUND

### A. Colorado Judgment Against Debtor Harwell

On July 12, 2005, Thomas Clay Hill ("Hill") obtained a Colorado judgment

---

[*]Honorable Marcia G. Cooke, United States District Judge for the Southern District of Florida, sitting by designation.

of $1.396 million against debtor Harwell. On July 27, 2005, Hill filed papers in Sarasota County, Florida attempting to domesticate his Colorado judgment against Harwell. Attorney Hutton represented Harwell in this domestication proceeding.

**B.     Debtor Harwell's $500,000 in Cash and Promissory Note**

At the time the Colorado judgment was entered, debtor Harwell owned interests in two Florida businesses. Harwell was a shareholder of the Center for Endoscopy, Inc. ("CFE"), a Florida corporation, and a member of Sarasota Endo Investors, LLC ("SEI"), a Florida limited liability company. Harwell engaged Hutton and his law firm to represent Harwell in disputes with other investors in CFE and SEI.

On August 11, 2005, debtor Harwell entered into a settlement agreement with SEI and CFE that provided he would receive $100,000 cash within 20 days for his interest in CFE; $400,000 cash within 30 days for his interest in SEI; and a $46,837 promissory note from SEI to Harwell to satisfy SEI's obligations to Harwell and as a return of capital.

On August 26, 2005, debtor Harwell answered post-judgment interrogatories from Hill, but did not disclose the settlement or information about the $546,837 in funds he would get from it. Hutton played no part in answering those interrogatories.

3

On September 1, 2005, CFE's settlement payment of $100,000 was deposited directly into Hutton's trust account. That same day, at Harwell's direction and with knowledge of Hill's judgment and collection attempts, Hutton disbursed the $100,000 in five checks:

| No. | Amount | Payee |
|---|---|---|
| 944 | $35,000 | Harwell |
| 945 | 25,000 | Harwell |
| 946 | 5,000 | Christine A. Harwell (Harwell's wife) |
| 947 | 25,000 | ASC Partners |
| 948 | 10,000 | Steven D. Hutton, P.L. Trust Account |
| | $100,000 | |

Next, Hutton wrote a letter, dated September 6, 2005, to SEI's counsel directing him to make the promissory note payment of $46,837 to Harwell's wife, Christine. On September 9, 2005, SEI made its $400,000 settlement payment directly to Hutton's trust account. That same day, at Harwell's direction, Hutton disbursed the $400,000 in seventeen checks:

| No. | Amount | Payee |
|---|---|---|
| 962 | $75,000[1] | Harwell |
| 963 | 33,700 | Christine A. Harwell (Harwell's wife) |
| 964 | 12,500 | Performance Trailers |
| 965 | 17,000 | VRS, Inc. |
| 966 | 20,000 | Ken Johnson |
| 967 | 21,000 | Commerce Bank |
| 968 | 10,500 | Superior Trailers |

[1]Both this check and check No. 971, also payable to Harwell, show as void on Hutton's bank statement. However, Hutton indicated in a letter he sent Harwell that check Nos. 962 and 971 were payable to Harwell in the amounts shown here.

| | | |
|---|---|---|
| 969 | 9,500 | Beneficial Finance |
| 970 | 15,000 | Stinar, Zendejas LLC |
| 971 | 50,000 | Harwell |
| 972 | 6,000 | MBNA |
| 973 | 4,600 | CitiFinancial |
| 974 | 50,000 | ASC Partners |
| 975 | 15,917 | Delbert Myers |
| 976 | 12,847 | Michael Miniat |
| 977 | 27,000 | Vintage Motors |
| 978 | 19,436 | Billy C. Harwell (Harwell's father) |
| | $400,000 | |

After these checks were written on September 9, but before they cleared, Hill obtained a turnover order from the Colorado court requiring debtor Harwell to (1) turn over any payments from SEI, and (2) turn over any funds Harwell received after July 12, 2005, that were still within his control.

**C. Hill's Garnishment of Hutton's Trust Account**

On September 19, 2005, judgment-creditor Hill served attorney Hutton with a writ of garnishment for any amounts held in trust for debtor Harwell. In response, Hutton stopped payment on check Nos. 962 and 971 issued to Harwell and totaling $125,000,[2] but not on several other checks that had not yet cleared Hutton's trust account and for which funds still remained in Hutton's trust account.

Hutton and debtor Harwell moved to quash Hill's garnishment based on Hill's domestication being defective on technical grounds. The Florida court

---

[2]Hutton's check Nos. 962 and 971 for $75,000 and $50,000, respectively, were payable to Harwell.

5

granted their motion on September 28, 2005.

**D. Hutton Disburses $125,000 from His Trust Account**

On September 28, 2005, the same day the Florida state court quashed the writ of garnishment, Hutton issued a check on his trust account to the Bank of Commerce for Harwell's remaining $125,000. Hutton personally visited the bank, delivered the $125,000 check, and obtained seven cashier's checks, including three $30,000 checks payable to Harwell's wife, his father, and creditor Montana Tractor, respectively:

| No. | Amount | Payee |
|---|---|---|
| 6988 | $15,000 | Robert Du[i]tch, Harwell's bankruptcy attorney |
| 6989 | 7,500 | American Express |
| 6990 | 30,000 | Billy C. Harwell, Harwell's father |
| 6991 | 30,062.96 | Christine A. Harwell, Harwell's wife |
| 6992 | 9,500 | IRS |
| 6993 | 30,000 | Montana Tractor Inc. |
| 6994 | 3,000 | J. Lichlyter |
| | $125,062.96 | |

In his deposition, Hutton testified that he obtained the seven cashier's checks to make sure the money was out of his trust account in case Hill sought another writ of garnishment. He also testified that these transactions were unusual and departed from the typical handling of client trust funds.

On October 10, 2005, Harwell filed for Chapter 11 bankruptcy protection[3] in

---

[3]Harwell's bankruptcy case was later converted to a Chapter 7 proceeding.

the United States Bankruptcy Court for the District of Colorado. Subsequent to that bankruptcy filing, Hutton assisted Harwell in converting the $30,000 cashier's check, No. 6993 payable to Montana Tractor, into a check payable to Harwell personally.

## II. PROCEDURAL HISTORY

On November 19, 2005, Appellant Martinez, as Chapter 7 bankruptcy trustee, filed a complaint against Hutton in the bankruptcy court in Colorado, seeking relief including Hutton's return of the $500,000 from the SEI and CFE settlements under, inter alia, 11 U.S.C. §§ 548(a)(1)(A) and 550(a)(1). Hutton responded with a motion to transfer the case to Florida, which the bankruptcy court in Colorado granted.

After the transfer to the United States Bankruptcy Court for the Middle District of Florida (hereinafter "bankruptcy court"), Hutton moved to dismiss Trustee Martinez's complaint. The bankruptcy court denied that motion.

Hutton then moved for summary judgment, which the bankruptcy court granted. The bankruptcy court stated the issue as: "Are there theories in which a Chapter 7 Trustee [Martinez] can go after the lawyer for personal liability where the lawyer is the mastermind and facilitator of the fraudulent conveyances"?

For the purposes of its summary judgment ruling, the bankruptcy court

expressly assumed that (1) "Mr. Hutton was the mastermind and the marionette that was driving all the pieces of what was a huge fraudulent conveyance of hundreds of thousands of dollars that would have been [otherwise] available for creditors," and (2) that Hutton "managed to coordinate things in a fashion that the settlement was concluded and the money funneled through Mr. Hutton's trust account to various preferred creditors and insiders in either preferential or fraudulent conveyances." Nonetheless, the bankruptcy court determined that Hutton was not an "initial transferee" of Harwell's money under § 550(a)(1) of the Bankruptcy Code because Hutton never had dominion and control over the money Hutton kept in his trust account for Harwell. The effect of this ruling was that Trustee Martinez could not recover the fraudulently-transferred funds from Hutton.

The bankruptcy court also addressed whether Trustee Martinez had cognizable claims against Hutton, under Florida law, for (1) aiding and abetting a fraudulent transfer or (2) civil conspiracy to effect a fraudulent transfer. Citing Freeman v. First Union National Bank, 865 So. 2d 1272, 1277 (Fla. 2004), the bankruptcy court determined that the Florida Uniform Fraudulent Transfer Act did not allow Trustee Martinez to assert a cause of action against Hutton for either aiding and abetting or civil conspiracy if Hutton was not an "initial transferee" of the money within the meaning of the Bankruptcy Code. The district court

8

affirmed.  <u>Martinez v. Hutton (In re Harwell)</u>, 414 B.R. 770 (M.D. Fla. 2009).

## III.  STANDARD OF REVIEW

"In bankruptcy appeals, this Court independently examines the factual and legal findings of the bankruptcy court using the same standards as did the district court."  <u>Trusted Net Media Holdings, LLC v. The Morrison Agency, Inc. (In re Trusted Net Media Holdings, LLC)</u>, 550 F.3d 1035, 1038 n.2 (11th Cir. 2008) (<u>en banc</u>).  We review the bankruptcy court's factual findings for clear error and its legal determinations <u>de novo</u>.  <u>Id.</u>  Under the familiar standard of Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[4]  Under this standard, the court must view the facts and make all reasonable inferences in favor of the nonmoving party.  <u>Loren v. Sasser</u>, 309 F.3d 1296, 1301–02 (11th Cir. 2002).

## IV. DISCUSSION

### A.  Bankruptcy Code §§ 548 and 550

---

[4]Federal Rule of Civil Procedure 56 was recently amended, effective December 1, 2010. <u>See</u> Fed. R. Civ. P. 56 advisory committee's note, 2010 amendments.  The standard for granting summary judgment remains the same.  <u>Id.</u>  Amendments to the Federal Rules of Civil Procedure govern proceedings after the date they are effective in an action then pending unless the Supreme Court specifies otherwise or the court determines that applying them in a particular action would be infeasible or work an injustice.  Fed. R. Civ. P. 86(a).  We apply the language of Rule 56 as amended.

Under § 548 of the Bankruptcy Code, the bankruptcy trustee "may avoid any transfer . . . of an interest of the debtor in property," made within two years before the filing of a bankruptcy petition, if the transfer was made "with actual intent to hinder, delay, or <u>defraud</u> . . ." any then- or future creditors.  11 U.S.C. § 548(a)(1)(A) (emphasis added).  Section 550(a) then provides that, to the extent that a transfer is avoided under § 548, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from," among others, "the initial transferee of such transfer."  11 U.S.C. § 550(a)(1).[5]  The Bankruptcy Code thus gives the bankruptcy trustee the ability to avoid fraudulent transfers under § 548 and to recover the value of those transfers from "initial transferees" under § 550(a)(1).

The main issue on appeal is whether attorney Hutton is an "initial transferee" under § 550(a)(1), which would allow the trustee to recover from Hutton the $500,000 placed in Hutton's trust account and distributed to Harwell, his family members, and selected creditors.  The Bankruptcy Code does not define

---

[5]Section 550(a) provides:
>(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 548[] . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from–
>>(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>>(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

10

"transferee," and there is no legislative history on that term. <u>Bonded Fin. Servs., Inc. v. European Am. Bank</u>, 838 F.2d 890, 893 (7th Cir. 1988) (stating Bankruptcy Code does not define transferee and that there "is no legislative history on the point").[6] Our Court has addressed the term "initial transferee" several times, albeit in different contexts, so we start there.

**B.    Chase & Sanborn**

Our first relevant case is <u>Nordberg v. Sanchez (In re Chase & Sanborn Corp.)</u> ("<u>Chase & Sanborn</u>"), 813 F.2d 1177 (11th Cir. 1987), where the bankruptcy trustee attempted to avoid a transfer as a fraudulent conveyance under § 548. <u>Id.</u> at 1178. The issue was whether the funds transferred were property of the debtor corporation, Chase & Sanborn.[7] <u>Id.</u> at 1180. Although <u>Chase & Sanborn</u> involved only § 548 and did not discuss the term "initial transferee" in § 550(a)(1), the analysis in <u>Chase & Sanborn</u> was adopted in later § 550(a)(1)

---

[6]However, the Bankruptcy Code defines the word "transfer" as broadly as possible, to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with [] property[] or [] an interest in property." 11 U.S.C. § 101(54); <u>see also</u> S. Rep. No. 95-989, at 27 (1987) ("The definition of transfer is as broad as possible. . . . Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control are interests in property. A deposit in a bank account or similar account is a transfer.").

[7]If the funds were property of the debtor, the trustee would be able to recover them. Otherwise, the funds would not be property of the estate and the trustee would have no power over them. <u>See</u> <u>Chase & Sanborn</u>, 813 F.2d at 1178–79 (concluding that because the funds were not Chase & Sanborn's property, the trustee could not recover them).

11

cases. So we review Chase & Sanborn first.

The debtor, Chase & Sanborn, was also known as the General Coffee Corporation. At one time, General Coffee Corporation was known as General Corporation of Coffee ("GCC"), a defunct corporation. Id. at 1179. The defunct GCC reopened a bank account solely for the purpose of laundering money for Alberto Duque Rodriguez ("Duque"). Duque was the president and sole owner of Domino Investments, a limited partnership. Id. Duque obtained a $5 million personal loan from the Arab National Bank, out of which which Duque transferred $660,000 to Domino. In turn, Domino transferred $660,000 into GCC's reopened bank account; GCC then transferred $350,000 of these funds to Sanchez, Duque's personal secretary, and ultimately the funds went to repay a loan obtained for Duque at the City National Bank. Id. The funds never went to a creditor of the debtor Chase & Sanborn.

This Court concluded that GCC's reopened bank account was an operating account of the debtor Chase & Sanborn because GCC was the name by which General Coffee Corporation previously was known, and the bank account itself had been used to pay a variety of Chase & Sanborn's expenses. Id. at 1180.

Nonetheless, this Court concluded the $350,000 placed in GCC's reopened bank account was not the property of the debtor Chase & Sanborn, because,

12

although the debtor had "possession" of the funds, it "did not have sufficient control over the funds to warrant a finding that the funds were the debtor corporation's property." Id. We stressed that "where a transfer to a noncreditor [Sanchez and later for Duque's loan] is challenged as fraudulent, more is necessary to establish the debtor's control over the funds than the simple fact that a third party [Duque] placed the funds in an account of the debtor [Chase & Sanborn] with no express restrictions on their use." Id. at 1181 (emphasis added). Instead, when determining whether the debtor has control over funds transferred to a noncreditor, "the court must look beyond the particular transfers in question to the entire circumstance of the transactions." Id. at 1181–82.

In Chase & Sanborn, we decided the debtor did not control the $350,000 transferred to Sanchez because (1) the source of the funds was Duque's personal loan from the Arab National Bank; (2) the eventual use of the funds transferred to Sanchez was to repay a loan obtained for Duque by Carlos Londono from the City National Bank; (3) "the actual connection between the funds and the debtor [Chase & Sanborn] was quite tangential: a two-day layover in a special account then only recently opened and soon thereafter closed;" and (4) "[t]he account, moreover, was opened under a name that the debtor no longer used." Id. at 1182. Given this evidence, we concluded that "Duque, not Chase & Sanborn, controlled the transfer

13

at issue," and that "the funds were not the property of the debtor, and thus that the transfer [was] not avoidable" in the first place. Id. Because the transfer was not avoidable under § 548 in the first place, the Court in Chase & Sanborn faced no issue regarding "initial transferees" under § 550(a)(1).

## C.    Nordberg

Next came Nordberg v. Societe Generale (In re Chase & Sanborn Corp.) ("Nordberg"), 848 F.2d 1196 (11th Cir. 1988), where the bankruptcy trustee sought to avoid the debtor's $500,000 transfer as a fraudulent conveyance. Id. at 1196. In Nordberg, the bankrupt debtor was again Chase & Sanborn. This time the debtor Chase & Sanborn itself wired $500,000 into the bank account of Colombian Coffee Corporation, Inc. ("Colombian") at a French bank, Societe Generale (the "bank"). Id. at 1196–97.

Before receiving the debtor's $500,000, the bank received a large check drawn on Colombian's bank account that, if honored, would create a large overdraft. Id. at 1198. The bank checked with Colombian, which assured the bank that wire transfers, for $500,000 and $700,000 each, were coming to cover Colombian's overdraft. The bank confirmed this with another bank, Credit Lyonnaise, which was wiring the funds. The bank then honored Colombian's large check. Id. Although the debtor Chase & Sanborn did not owe any money to

14

Colombian, these wired funds from Chase & Sanborn came to Colombian's

account at the bank.[8]  Id. at 1199 n.7.

Seeking to recover the debtor's $500,000 from the bank, the bankruptcy

trustee had to show that (1) debtor Chase & Sanborn's $500,000 transfer was a

fraudulent transfer under § 548; and (2) the bank was a party from whom the

trustee could recover under § 550(a).  Id. at 1198.  This Court assumed, as had the

bankruptcy court, that the trustee proved fraud and focused on whether the trustee

could recover from the bank under § 550(a).  Id. at 1198–99.

In Nordberg, we reviewed our earlier decision in Chase & Sanborn, stating

that there we "adopted the control test to determine whether a debtor had

possession of property allegedly recoverable under section 548."  Id. at 1199. The

Nordberg Court noted that in Chase & Sanborn, "[t]he issue which troubled our

court was not whether the property went to the alleged transferee, but whether it

came from the [bankrupt] debtor, the alleged transferor."  Id. (emphasis in

original).  We observed that "[t]he test" from Chase & Sanborn "is a very flexible,

pragmatic one; in deciding whether debtors had controlled property subsequently

sought by their trustees, courts must 'look beyond the particular transfers in

_____

[8]At the time the bank honored Colombian's check, the two wire transfers had not yet
arrived, and the bank listed an overdraft on Colombian's account for two days (November 29
and 30).  Nordberg, 848 F.2d at 1198.  After 4 p.m. on November 30, the $500,000 in wired
funds from the bankrupt debtor Chase & Sanborn came to Colombian's account at the bank.  Id.

15

question to the entire circumstance of the transactions.'" Id. (quoting Chase & Sanborn, 813 F.2d at 1181-82). The Nordberg Court explained that "[t]he control test, then, as adopted by this circuit, simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." Nordberg, 848 F.2d at 1199 (emphasis added). We stressed "[t]his approach is consistent with the equitable concepts underlying bankruptcy law." Id. (emphasis added). We added that the general approach articulated in Chase & Sanborn applies "whether a court is attempting to determine whether a debtor controlled the transferred funds it transferred to a defendant or a defendant gained control over the funds transferred to it." Id.

After reviewing Chase & Sanborn, this Court in Nordberg applied this equitable doctrine—looking beyond the particular transfer and evaluating the circumstances of a transaction in its entirety to ensure the result is equitable—to the bankrupt debtor's $500,000 transfer to Colombian's account at the bank. This Court noted that if we applied a "literal interpretation of section 548," the defendant bank "had received the funds from the debtors and could be termed [an] 'initial transferee[].'" Id. at 1200. We observed, however, that courts in the past "have traditionally evaluated [the] defendant's status in light of the entire transaction" and "have refused to allow trustees to recover property from

16

defendants who simply held the property as agents or conduits for one of the real parties to the transaction." Id. at 1199–1200. The Nordberg Court stated that although a defendant bank may have received funds, technically making it an initial transferee, it would be inequitable to allow recovery where the defendant bank never controlled the funds. Id. at 1200.

In Nordberg, we distinguished the situation where a bank receives money from a debtor to pay off a loan, in which case the bank has control over the funds and is an initial transferee, from where a bank receives money being deposited into a customer's account, in which case the bank is a mere conduit, never has actual control of the funds, and is not an initial transferee. Id. The Nordberg Court made clear that equitable considerations played a major role in the control test, stating that "[i]t is especially inequitable to hold conduits liable in situations in which the conduits cannot always ascertain the identity of the transferor." Id. at 1201. We explained that if we were to require banks to examine the source of a wire transfer and determine its solvency, then "it would impose an unfair burden on the banks and would severely impair the wire transfer system." Id. at 1202.

The Nordberg Court then evaluated the transaction involving Chase & Sanborn, Colombian, and the bank in its entirety. We emphasized that: (1) the overdraft and wired funds were "virtually simultaneous"; (2) the bank honored

17

Colombian's check that created the overdraft only after it knew another bank (Credit Lyonnaise) had wired the money to cover it; and therefore that (3) the bank's "decision to honor Colombian Coffee's check did not establish a debtor-creditor relationship between Colombian Coffee and [the bank]." Id. at 1201–02. Based on the transaction as a whole, we concluded that the bank was a conduit and not a transferee, also stating: "Under the particular facts of this case, the transaction does not fall within the provisions of the bankruptcy law on voidable transfers." Id. at 1202 (emphasis added).

D.    **IBT**

Next came IBT, addressing whether the bankruptcy trustee must avoid transfers to an "initial transferee" of funds before it can pursue subsequent transferees. IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.), 408 F.3d 689, 703 (11th Cir. 2005). This Court observed that "[t]he determination whether a particular party is an 'initial transferee' within the meaning of § 550(a)(1) has not been as straightforward as the language itself might suggest." Id. at 705. The IBT Court acknowledged that "[a] strictly literal interpretation of the statutory term would suggest that the 'initial transferee' of a transfer is the first party which received possession of the property in question after it left the hands of the debtor." Id. We observed that the "courts are disinclined to construe the statute [§ 550(a)]

18

in such a rigid manner" and "have created a more malleable approach to § 550(a)" which recognizes that a "'mere conduit' cannot be considered an 'initial recipient' for purposes of an avoidance action." Id. We added that "[t]he mere conduit rule is used most frequently in situations where banks act as an intermediary in transferring assets." Id.

In explaining the conduit or control test, this Court in IBT eschewed the literal statutory language of § 550(a), saying that a rigid interpretation would be unfair "because in many instances the initial recipient may have nothing to do with the debtor's property other than facilitating its transfer." Id. Banks and other intermediary institutions are to be shielded from § 550 liability "because [they] never exercised any control over the Debtor's funds." Id.

After referring to the mere conduit rule as an "exception" to the statutory language, we explained that: "As we read it, the conduit rule presumes that the facilitator of funds acts without bad faith, and is simply an innocent participant to the underlying fraud." Id. (emphasis added). We determined that the initial recipients of the funds in IBT could not be classified as mere conduits because they did not "conjure images of well-intentioned, but gullible, parties who mistakenly fell victim to a massive conspiracy," but instead "had intimate and thorough knowledge of the transactions and their desired effect." Id. at 705-06. We

19

concluded that "[t]his case does not merit the 'mere conduit' distinction that we carved out in Chase & Sanborn or Nordberg." Id. at 706. We stressed that the purpose of a fraudulent transfer action "is to expose fraudulent dealings." Id.

**E. Pony Express**

We next examined § 550(a)(1)'s term "initial transferee" in Andreini & Co. v. Pony Express Delivery Services, Inc. (In re Pony Express Delivery Services, Inc.) ("Pony Express"), 440 F.3d 1296 (11th Cir. 2006). The bankruptcy trustee sought to recover from Andreini (an insurance broker) a wire transfer from debtor Pony Express to Andreini's trust account to cover premiums remitted to the debtor's insurance carriers. Id. at 1299. The issue was whether Andreini was the "initial transferee" under § 550(a)(1) of an avoidable preference under § 548. Id. at 1300.

In Pony Express, this Court said that "[t]he term 'initial transferee' is a term of art whose meaning in any given transaction is not always straightforward." Id. This Court explained that we had "adopted a 'control' or 'conduit' test to determine whether the recipient of an avoidable transfer of assets is the initial transferee." Id. "Under this test, a recipient of an avoidable transfer is an initial transferee only if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes, and not if they merely

20

served as a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee." Id.

In Pony Express, this Court pointed out that "[t]his [control] test takes on special significance where the recipients of avoidable transfers are agents or fiduciaries of the debtor-transferor, such as banks or, in this case, insurance brokers, who are duty-bound to take only limited actions with respect to the funds received." Id. at 1300–01. "Often these fiduciaries or agents are not considered initial transferees because their legal control over the assets received is circumscribed by their legal duties to their clients." Id. at 1301. Fiduciaries or agents, however, are not immune from becoming "initial transferees." Rather, "even entities that have special legal relationships with the debtor-transferor can be initial transferees when they do, in fact, take legal control of an avoidable transfer; for example when they receive assets directly from the debtor-transferor as compensation for services or in payment of a genuine debt." Id.

In Pony Express, this Court repeated that in ascertaining whether a fiduciary exercised sufficient control over the debtor's assets to be an "initial transferee," "courts must look at all the circumstances of the transaction that resulted in the avoidable transfer." Id. We reached back to Nordberg, citing it for the propositions that "[t]he control test 'is a very flexible, pragmatic one; . . . courts

21

must look beyond the particular transfers in question to the entire circumstance of the transactions,'" Pony Express, 440 F.3d at 1302 (quoting Nordberg, 848 F.2d at 1199) and "[t]he court must 'step back and evaluate a transaction in its entirety to make sure that [its] conclusions are logical and equitable.'" Id. at 1302 (quoting Nordberg, 848 F.2d at 1199 (emphasis added)). We again emphasized that "'[t]his approach is consistent with the equitable concepts underlying bankruptcy law.'" Id. at 1302 (quoting Nordberg, 848 F.2d at 1199 (emphasis added)).

After considering the circumstances surrounding the transaction in its entirety, this Court concluded that: (1) Andreini was merely a conduit for Pony Express's insurance premiums; (2) that "no genuine debt was created" between debtor Pony Express and Andreini; and (3) "Andreini did not exercise legal control over the wire transfer and is not the initial transferee under 11 U.S.C. § 550." Id. at 1303-04. There was no allegation that Andreini acted in bad faith, and Andreini successfully invoked the equitable mere conduit exception set forth earlier in Nordberg.[9]

## F.    What Our Precedents Demonstrate

Taking Chase & Sanborn, Nordberg, IBT, and Pony Express together, a

---

[9]We recognize Hutton stresses that Andreini had no discussion of good faith, but this is explained by the stark absence of any facts in Andreini suggesting bad faith. In any event, Andreini does not alter our prior precedent in Nordberg and IBT.

22

clear pattern emerges. First, this Court has observed that a literal or rigid interpretation of the statutory term "initial transferee" in § 550(a) means that the first recipient of the debtor's fraudulently-transferred funds is an "initial transferee." Nordberg, 848 F.2d at 1199–1200; accord IBT, 408 F.3d at 705.

Second, this Court carved out an equitable exception to the literal statutory language of "initial transferee," known as the mere conduit or control test, for initial recipients who are "mere conduits" with no control over the fraudulently-transferred funds. See Chase & Sanborn, 813 F.2d at 1178–80; see also Pony Express, 440 F.3d at 1300; IBT, 408 F.3d at 705; Nordberg, 848 F.2d at 1199. In doing so, this Court has adopted a flexible, pragmatic, equitable approach of looking beyond the particular transfer in question to the circumstances of the transaction in its entirety. Nordberg, 848 F.2d at 1199; accord Pony Express, 440 F.3d at 1302; see IBT, 408 F.3d at 705. The mere conduit or control test is a judicial creation that is not based in statutory language, but is an exception based on the bankruptcy courts' equitable powers. Nordberg, 848 F.2d at 1199 ("This approach is consistent with the equitable concepts underlying bankruptcy law."); see also Bank of Marin v. England, 385 U.S. 99, 103, 87 S. Ct. 274, 277 (1966) ("[E]quitable principles govern the exercise of bankruptcy jurisdiction."). Equitable considerations play a major role in the mere conduit or control test

23

because it would be inequitable to hold an initial recipient of the debtor's fraudulently-transferred funds liable where that recipient could not ascertain the transferor debtor's solvency, lacked any control over the funds, or lacked knowledge of the source of the funds. See Nordberg, 848 F.2d at 1199–1202. The conduit or control test is based on, and defined by, equity and requires good faith to escape "initial transferee" liability. In effect, we have tempered literal application of § 550(a)(1), examining all the facts and circumstances surrounding a transaction to prevent recovery from a transferee innocent of wrongdoing and deserving of protection.

Third, as part of the mere conduit or control test, this Court considers whether the intermediary "acts without bad faith, and is simply an innocent participant" to the fraudulent transfer. See IBT, 408 F.3d at 705 (stating "the conduit rule presumes that the facilitator of funds acts without bad faith, and is simply an innocent participant to the underlying fraud."); accord Huffman v. Commerce Sec. Corp. (In re Harbour), 845 F.2d 1254, 1258 (4th Cir. 1988) (concluding that because an initial recipient of funds is asking the court to ignore the literal meaning of § 550(a)(1), invoke its equitable powers and grant mere conduit status, "this party must have acted in 'good faith' with respect to the relevant transaction in order to be spared the effects of [§ 550(a)(1)]").

24

Consistent with our precedent, we conclude that good faith is a requirement under this Circuit's mere conduit or control test. Accordingly, initial recipients of the debtor's fraudulently-transferred funds who seek to take advantage of equitable exceptions to § 550(a)(1)'s statutory language must establish (1) that they did not have control over the assets received, i.e., that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor <u>and</u> (2) that they acted in good faith and as an innocent participant in the fraudulent transfer.[10]

With this background, we turn to Hutton's role in Harwell's fraudulent transfers.

## G. Hutton's Status

As noted earlier, the bankruptcy court assumed that the debtor Harwell made fraudulent transfers of his $500,000 in settlement proceeds to Hutton's trust account and then had Hutton quickly transfer those funds to Harwell, his family members, and selected creditors. Most importantly for this appeal, the bankruptcy court also assumed that Hutton was the mastermind of this fraudulent conveyance scheme devised to funnel Harwell's money into and out of Hutton's trust account. Indeed, Hutton personally knew about Hill's $1.396 million judgment against

---

[10]To the extent Hutton argues this principle is only dicta in our precedent, we disagree. In any event, we now explicitly hold that good faith is a requirement under this Circuit's mere conduit or control test.

25

debtor Harwell and that creditor Hill was aggressively seeking to collect $1.396 million from Harwell. Hutton knew about Harwell's $500,000 in settlement proceeds and used his trust account to quickly transfer them to selected creditors, Harwell's family members, and Harwell himself. In fact, Hutton used his trust account to pay $10,000 of Harwell's settlement proceeds to his law firm. The courts thus assumed the transfers into and out of Hutton's trust account were made to defraud other creditors such as judgment-creditor Hill.

The first issue on appeal, therefore, is whether Hutton is an "initial transferee" under § 550(a)(1). Applying the above principles garnered from our precedent, we conclude Hutton is an "initial transferee" under § 550(a)(1). Hutton does not dispute he was the initial recipient of the debtor's funds. The debtor Harwell settled disputes with CFE and SEI for $100,000 and $400,000, respectively. The debtor had his funds sent to Hutton. And Hutton undisputedly received the funds and deposited them into Hutton's trust account. We recognize that Hutton quickly sent the funds to subsequent transferees by issuing twenty-two checks on his trust account. However, Hutton was the initial recipient of the funds and thus the "initial transferee" under the language of § 550(a)(1).

The next issue on appeal is whether Hutton may equitably escape his "initial transferee" status. Given the bankruptcy court's assumption that Hutton

participated in the fraud, Hutton is not entitled to summary judgment as a matter of law on his assertion of the mere conduit or control defense. Hutton, as the initial recipient of the funds, convinced the bankruptcy and district courts to award him mere conduit status because he lacked control over Harwell's funds in his trust account and paid them out to creditors and other persons selected by debtor Harwell and at Harwell's direction. The problem for Hutton is that the mere conduit or control test is an equitable doctrine. It was fashioned in bankruptcy cases to prevent the unjust or inequitable result of holding an innocent transferee liable for fraudulent transfers where the innocent transferee is a mere conduit and had no control over the funds transferred. To take advantage of this equitable doctrine, Hutton himself must have acted in good faith and have been an innocent participant in the transfers in and out of his trust account. Here the courts, for purposes of their summary judgment rulings, assumed Hutton was the mastermind of this huge fraudulent transfer scheme. Thus Hutton is not entitled to summary judgment based on the mere conduit or control exception. Notwithstanding the appearance that Hutton acted in bad faith, the bankruptcy court, for purposes of its summary judgment ruling, never made findings regarding bad faith but rather assumed Hutton was the mastermind of a fraudulent transfer scheme. In light of our holding today clarifying that the equitable mere conduit defense requires a

27

showing of good faith, this case must be remanded. On remand, both parties shall be given the opportunity to present evidence and argument to the bankruptcy court as to whether Hutton had or lacked control of the funds and as to whether Hutton acted in good or bad faith.

In the vast majority of cases, a client's settlement funds transferred in and out of a lawyer's trust account will be just like bank transfers, and lawyers as intermediaries will be entitled to mere conduit status because they lack control over the funds. Mere conduits, such as lawyers and banks, do not have an affirmative duty to investigate the underlying actions or intentions of the transferor. However, under the particular circumstances of this case and given the bankruptcy court's assumptions about Hutton's major role in the fraudulent transfer of these funds in issue, Hutton is not entitled to summary judgment in his favor based on the mere conduit or control test.

## V. CONCLUSION

For all of these reasons, we reverse the district court's grant of summary judgment in favor of Hutton on Trustee Martinez's federal claim under §§ 548(a)(1)(A) and 550(a)(1) and remand this case to the district court with instructions to remand it to the bankruptcy court for further proceedings consistent with this opinion.

28

Finally, because the bankruptcy and district courts' rulings on Trustee Martinez's state law claims relied in part on their conclusion that Hutton was not an "initial transferee," we reverse the grant of summary judgment on those state law claims too and remand those claims too to the district court with instructions to remand them to the bankruptcy court for reconsideration in the first instance. We express no opinion on the state law claims.

**REVERSED AND REMANDED.**