[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-16489
_____

D.C. Docket No. 9:12-cv-80664-KMM,
BKCY No. 10-03455-BKC-PGH

In Re: CUSTOM CONTRACTORS, LLC,

Debtor.
_____

DEBORAH C. MENOTTE,

Plaintiff - Appellant,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 26, 2014)

Before CARNES, Chief Judge, WILSON and FAY, Circuit Judges.

WILSON, Circuit Judge:

This case arises from an attempt by Deborah C. Menotte, as trustee for the estate of Custom Contractors, LLC (Debtor), to avoid eight transfers made by the Debtor to the Internal Revenue Service (IRS) as payment for the income tax liability of the Debtor's principal, Brian Denson. The bankruptcy court ruled in favor of the United States as to the first seven transfers, finding that Menotte failed to prove all the elements of constructive fraud because she could not show the Debtor was operating with unreasonably small capital at the time of the transfers. As to the eighth transfer, Menotte succeeded in proving constructive fraud, and the bankruptcy court ruled that the IRS was an initial transferee from whom Menotte could seek recovery. The district court affirmed the bankruptcy court's judgment with regard to the first seven transfers. However, it reversed as to the eighth, based upon its determination that the IRS could not be held liable as an initial transferee because it qualified for the mere conduit exception. For the reasons set forth below, we affirm the district court's decision.

## I.

Denson formed the Debtor in 2006 as a single-member limited liability company operating a commercial construction business and structured it as a Subchapter S corporation, commonly referred to as a "pass through" entity. Unlike ordinary corporations, S corporations do not pay federal income tax. Instead, the profits "pass through" to the shareholders—here, Denson—and are reported as

2

income on the shareholders' personal tax returns.  Denson paid the taxes on his pass through income by causing the Debtor to send checks directly to the IRS using funds from the company's operational account.  These payments, which were made in 2007 and 2008, were listed as distributions to Denson in the Debtor's books.[1]

The Debtor operated at a loss in 2008, leaving Denson with no tax liability and obligating the IRS to grant a refund, upon Denson's request, for the amount of the 2008 estimated tax payments the Debtor made to the IRS on Denson's behalf.  *See* 26 U.S.C. § 6402.  The IRS refunded the payments, but Denson—who received a distribution for them—did not return the funds to the Debtor.

On July 15, 2009, the Debtor filed for relief under Chapter 7 of the Bankruptcy Code.  After being appointed Trustee, Menotte filed an adversary proceeding in the United States Bankruptcy Court for the Southern District of Florida alleging, under various theories of federal and state law, that the eight

---

[1] The Debtor issued the first check on April 16, 2007, in the amount of $73,801 as payment of Denson's 2006 income tax liability.  The second check, issued on the same day, was in the amount of $22,110 and covered Denson's estimated 2007 income tax liability.  The third check was issued in the amount of $22,110 on June 1, 2007, and supplemented the payment for Denson's expected 2007 income tax liability.  On April 1, 2008, the Debtor issued a fourth check, this one in the amount of $26,380, to cover Denson's estimated 2008 income tax liability.  The Debtor issued a fifth check—in the amount of $2,644—on April 9, 2008, as payment of Denson's remaining 2007 income tax liability.  The sixth check, covering Denson's estimated 2008 income tax liability, was issued on June 3, 2008, in the amount of $26,380.  On June 30, 2008, the Debtor issued the seventh check—as payment of a penalty for failing to make sufficient estimated 2007 income tax payments—in the amount of $151.25.  The eighth and final check was issued on September 15, 2008, in the amount of $26,380 and supplemented Denson's estimated 2008 income tax payment.

payments made by the Debtor to the IRS for the personal tax liability of Denson were fraudulent transfers. The bankruptcy court held a two-day trial and determined that the eighth payment was a constructively fraudulent transfer because it was made while the Debtor was insolvent, and the Debtor did not receive reasonably equivalent value. Furthermore, the bankruptcy court held that the IRS was an initial transferee under 11 U.S.C. § 550(a)(1) and did not qualify for the mere conduit exception. Thus, Menotte could recover the amount of the eighth transfer from the Government. However, because Menotte failed to prove that the Debtor was insolvent or had unreasonably small capital at the time of the first seven transfers, the bankruptcy court held that those payments were not fraudulent.

The district court affirmed the decision as to the first seven transfers, holding that the bankruptcy court properly considered all the evidence and did not clearly err in finding that the Debtor was not operating with unreasonably small capital. As to the IRS's status as a mere conduit, the district court reversed, stressing the "flexible, pragmatic, equitable approach" adopted by this court and noting that "a strict application of the exception to the present situation would result in an illogical outcome," requiring the IRS to refund the money for a second time. The district court, "analyzing the transaction in its entirety," held that the IRS merely

4

acted as an intermediary, holding "the funds until Denson's tax liability could be assessed." Thus, the IRS was not liable as an initial transferee under § 550.

On appeal, Menotte asks this court to reverse the finding that the Debtor was not operating with unreasonably small capital, arguing that the bankruptcy court completely disregarded evidence that the downturn suffered by the construction industry in 2008 was foreseeable. Menotte also argues that the district court erred when it ruled that the IRS qualified for the mere conduit exception. The United States asks us to affirm the district court and argues that sovereign immunity bars recovery as to the first three transfers.

## II.

"As the second court of review of a bankruptcy court's judgment, we independently examine the factual and legal determinations of the bankruptcy court and employ the same standards of review as the district court." *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 698 (11th Cir. 2005) (internal quotation marks omitted). Determinations of law made by the bankruptcy court or the district court are reviewed de novo. *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1310 (11th Cir. 2012). The bankruptcy court's findings of fact are reviewed for clear error. *Id.* "[F]indings of fact are not clearly erroneous unless, in light of all the evidence, we are left with the definite and firm conviction that a mistake has

5

been made." *Westgate Vacation Villas, Ltd. v. Tabas (In re Int'l Pharmacy & Discount II, Inc.)*, 443 F.3d 767, 770 (11th Cir. 2005) (per curiam).

### III.

Section 550(a) of the Bankruptcy Code allows a trustee to recover, from initial transferees, the value of certain avoidable transfers made by a debtor.[2]  11 U.S.C. § 550(a)(1).  Thus, to succeed in her efforts to recover from the IRS, Menotte must show that the transfers—tax payments by the debtor made on behalf of Denson—are avoidable and that the IRS qualifies as an initial transferee.  *See id.*

### A.

Menotte seeks to avoid the first three transfers under 11 U.S.C. § 544(b)(1).  Section 544(b)(1) allows a trustee to "avoid any transfer of an interest of the debtor . . . that is voidable under applicable law by a creditor holding an unsecured claim."  11 U.S.C. § 544(b)(1).  Menotte argues that she can avoid the first three transfers under § 544(b)(1) because they are voidable under Florida law, specifically the Florida Uniform Fraudulent Transfer Act (FUFTA).  *See* Fla. Stat. § 726.105(1)(b)(1).  In response, the government asserts that we lack jurisdiction to

---

[2] Here, Menotte sought to avoid the transfers under 11 U.S.C. §§ 544 and 548.

adjudicate Menotte's § 544 claims because they do not fall within the scope of the waiver of sovereign immunity set forth in 11 U.S.C § 106(a).[3]

Sovereign immunity acts as a jurisdictional bar that shields the federal government from suits to which it has not consented. *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S. Ct. 996, 1000 (1994); *Asociacion de Empleados del Area Canalera (ASEDAC) v. Pan. Canal Comm'n*, 453 F.3d 1309, 1315 (11th Cir. 2006) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." (internal quotation marks omitted)). Such consent exists where Congress has "unequivocally expressed" its intent to waive sovereign immunity. *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33, 112 S. Ct. 1011, 1014 (1992) (internal quotation marks omitted). By enacting § 106, Congress unequivocally expressed its intent to abrogate sovereign immunity as to claims brought under § 544. *See Hardy v. United States ex rel. IRS (In re Hardy)*, 97 F.3d 1384, 1388 (11th Cir. 1996) (noting that § 106(a) acts as an "unequivocal waiver" of sovereign immunity for the "specifically enumerated bankruptcy provisions" found therein). Thus, contrary to the government's argument, we have jurisdiction over Menotte's § 544(b)(1) claims.

---

[3] 11 U.S.C. § 106(a) provides, in pertinent part: "Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following: (1) Sections . . . 544, . . . 548, . . . [and] 550."

However, the government argues that this does not end our inquiry because § 544(b)(1) requires trustees to prove the existence of an actual unsecured creditor who could avoid the challenged transfer in state court. *See* 11 U.S.C. § 544(b)(1); *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 260 (5th Cir. 2010) ("If an *actual, unsecured creditor* can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of *that creditor* and avoid the debtor's transfer." (emphasis added) (internal quotation marks omitted)).  The government argues that Menotte cannot satisfy the actual creditor requirement of § 544(b)(1) because sovereign immunity would bar any unsecured creditors from suing the IRS in state court under FUFTA.  Menotte suggests, however, that § 106(a) precludes the use of sovereign immunity as a defense to both § 544 and the underlying FUFTA claim.

The issue presented by the parties, then, is what effect, if any, § 106(a) has on the substantive requirements of § 544(b)(1).  That is, does the government's abrogation of sovereign immunity with respect to § 544 allow a trustee to succeed on his § 544(b)(1) claim without showing the existence of an actual unsecured creditor who could avoid the transfer under state law?  A number of bankruptcy courts to address this issue have found that § 106(a)'s abrogation of sovereign immunity does just that.  *See, e.g.*, *VMI Liquidating Trust Dated December 16, 2011 v. United States (In re Valley Mortg., Inc.)*, No. 10–19101–SBB, 2013 WL

8

5314369, at *4 (Bankr. D. Colo. September 18, 2013); *Zazzali v. Swenson (In re DBSI, Inc.)*, No. 08–12687(PJW), 2011 WL 607442, at *5 (Bankr. D. Del. Feb. 11, 2011); *Furr v. United States Dep't of Treasury (In re Pharmacy Distrib. Servs., Inc)*, 455 B.R. 817, 820–21 (Bankr. S.D. Fla. 2011); *Tolz v. United States (In re Brandon Overseas, Inc.)*, No. 08–11035–BKC–RBR, 2010 WL 2812944, at *4 (Bankr. S.D. Fla. July 16, 2010); *Liebersohn v. IRS (In re C.F. Foods, L.P.)*, 265 B.R. 71, 85–86 (Bankr. E.D. Pa. 2001).  More recently, however, the Seventh Circuit considered the issue and held that "§ 106(a)(1) does not displace the actual-creditor requirement in § 544(b)(1)." *In re Equip. Acquisition Res., Inc.*, 742 F.3d 743, 744 (7th Cir. 2014).

We need not decide the issue, however, because Menotte has failed to prove that the transfers were avoidable under FUFTA.  *See infra* Part III.B.  Therefore, regardless of whether Menotte can—or must—prove the existence of an actual creditor, her attempt to avoid the transfer fails for other reasons to which we now turn.  Thus, having determined that we have jurisdiction to hear Menotte's § 544(b)(1) claims, we move to the other issues before this court.[4]

**B.**

---

[4] The issue of whether sovereign immunity bars us from hearing Menotte's claims is different from the issue in *In re Equipment Acquisition Resources, Inc.*, which addresses the impact of § 106(a)'s abrogation of sovereign immunity on the actual creditor requirement of § 544(b)(1), *see* 742 F.3d at 747.

As discussed above, Menotte challenges the first three transfers using § 544(b)(1) and FUFTA.  As for the rest of the transfers, Menotte seeks to avoid them under § 548 of the Bankruptcy Code.  *See* 11 U.S.C. § 548(a)(1)(B).

Under FUFTA, a transfer is fraudulent when a debtor "[w]as engaged . . . in a . . . transaction for which the remaining assets of the debtor were unreasonably small" and failed to receive reasonably equivalent value.  Fla. Stat. § 726.105(1)(b)(1).  Similarly, § 548 allows a trustee to avoid a transfer when "the debtor . . . was engaged in . . . a transaction . . . for which any property remaining with the debtor was an unreasonably small capital" and for which the debtor failed to receive "reasonably equivalent value."  11 U.S.C. § 548(a)(1)(B).  The bankruptcy court denied these claims based on its finding that the Debtor was not left with unreasonably small capital after the first seven transfers, and the district court affirmed.

Menotte alleges that the bankruptcy court failed to give due credit to the testimony of her expert, Alan Barbee.  At trial, Barbee testified that the Debtor was operating with unreasonably small capital based, in part, on his determination that the impending deterioration of the housing market required the Debtor to keep a greater amount of capital.  The bankruptcy court discredited this testimony, noting that "[t]o the extent that Mr. Barbee's opinion is based upon the need for additional capital because of the risk of being in the construction industry in the middle of a

10

downturn, it appears to suffer from hindsight bias." Menotte claims that this amounted to a "wholesale rejection" of the evidence as irrelevant and constituted error as a matter of law. We disagree.

Menotte's argument rests on her assertion that the bankruptcy judge completely disregarded Barbee's evidence related to the economic downturn. However, the record does not support this allegation. Rather, the record shows that the court considered all of the evidence presented by Barbee but discredited his opinion based on a finding that it was influenced by hindsight bias. As such, the bankruptcy court did not err as a matter of law. Nor can we say, based on the record, that the bankruptcy court clearly erred in determining that the Debtor was not operating with unreasonably small capital. Thus, we affirm the district court's decision.

## C.

Section 548 of the Bankruptcy Code allows a trustee to "avoid any transfer . . . of an interest of the debtor" made within the two years before the filing of a bankruptcy petition when "the debtor voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for such transfer or obligation; and . . . was insolvent on the date that such transfer was made." 11 U.S.C. § 548(a)(1)(B). A trustee may recover the value of a transfer avoidable under § 548 from "the initial transferee of such transfer." 11 U.S.C. § 550(a)(1). The

11

bankruptcy court found, and the parties do not disagree, that the eighth payment made by the Debtor to the IRS was avoidable under § 548 because the Debtor was insolvent at the time of the transfer and did not receive reasonably equivalent value in exchange.  The parties only dispute whether the IRS qualifies as an initial transferee from whom Menotte can recover under § 550(a)(1).

The IRS argues that it is not an initial transferee because it lacked control over the fraudulently transferred funds, making it eligible for the mere conduit exception most recently recognized by this court in *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1322 (11th Cir. 2010).  The district court agreed, and held that the bankruptcy court erred in finding "that the IRS . . . did not qualify for the conduit defense."  We review the district court's application of our mere conduit law to these facts de novo.  *See Northern*, 408 F.3d at 698, 703–08.

"The term 'initial transferee' is a term of art whose meaning in any given transaction is not always straightforward." *Andreini & Co. v. Pony Express Delivery Servs., Inc. (In re Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296, 1300 (11th Cir. 2006).  A "literal or rigid interpretation" of the term leads to the conclusion that "the first recipient of the debtor's fraudulently-transferred funds is an initial transferee." *Harwell*, 628 F.3d at 1322 (internal quotation marks omitted).  Recognizing the inequity that would result if every initial recipient of fraudulently-transferred funds could be forced, as an initial transferee, to return the

12

funds to the bankrupt's estate, this court crafted an exception—grounded in the equitable powers of the bankruptcy court—known as the "mere conduit or control test."[5]  *Id.*  To meet the mere conduit or control test and avoid liability as an initial transferee under § 550, an initial recipient of a debtor's fraudulently-transferred funds must show "(1) that they did not have control over the assets received, i.e., that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor *and* (2) that they acted in good faith and as an innocent participant in the fraudulent transfer."  *Id.* at 1323.  This test, which is "based on, and defined by, equity," requires a court to take a "flexible, pragmatic, equitable approach," considering a transaction in its entirety, rather than focusing in on the particular transfer in question.  *Id.* at 1322.

The question before us is whether the IRS satisfies the control prong.  In *Pony Express*, we stated that an initial recipient fails this prong "if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes."  440 F.3d at 1300.  However, we noted that in situations

---

[5] We have previously distinguished the control test from the conduit test.  *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 598–99 (11th Cir. 1990) (noting that the control test "involved the degree of control over transferred funds exercised by the *transferor*," whereas the conduit test "addressed the distinct issue of the *transferee's* control over such funds" (internal quotation marks omitted)).  Although the tests are used in different circumstances, there is no difference in their analytical approach.  S*ee Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199–1200 (11th Cir. 1988).  As a result of this analytical similarity, we have seemingly stopped distinguishing between the two tests.  *See Harwell*, 628 F.3d at 1322 (referring to the test as the "mere conduit or control test").  Accordingly, we refer to the test as the mere conduit or control test.

where the initial recipient is an entity that owes "legal obligations to the debtor-transferor . . . , the control test turns on the recipient's legal rights and obligations toward the transferred assets, not simply their legal relationship with the debtor-transferor or the ultimate use of the assets." *Id.* at 1301. Thus, when applying the conduit test, we must consider both the initial recipient's legal rights to the funds at issue as well as any existing obligations. "To ascertain these rights and obligations, . . . [we] look at all the circumstances of the transaction that resulted in the avoidable transfer." *Id.*

Our precedent dealing with the mere conduit or control test offers principles to guide our analysis. We have consistently found that when an initial recipient receives funds as payment of an existing debt, the recipient exercises sufficient control to be held liable as an initial transferee. *See id.* at 1302 ("[U]nder the control test, the initial transferee question turns on whether a debt existed . . . ."); *Arab Banking*, 904 F.2d at 599–600 (holding a bank liable as an initial transferee where it received funds from a debtor as payment of a third party's debt owed to the bank); *Societe Generale*, 848 F.2d at 1200 (noting that banks that receive funds as payment of a debt gain control over the funds, whereas banks that receive funds as a deposit into an account do not). Implicit in these cases is the principle that funds received as payment of a debt leave the recipient with no obligations; that is, the transferee receives them with no strings attached. Thus, neither the transferor,

14

nor any other party, has any rights—currently held, expected to accrue, or even currently held but expected to vanish—in the funds held by the initial transferee. Additionally, we have held that a bank that merely receives funds as a deposit into an account does not exercise control over those funds. *Societe Generale*, 848 F.2d at 1200–02. We have said this despite the fact that a bank has legal rights to put deposited funds to use. Banks regularly use deposited funds by giving them out in the form of loans. Indeed, this is a bank's primary source of income. Our case law, then, stands for the proposition that, when a bank receives funds in the form of a deposit, the attendant obligations owed to the transferor—namely to return the funds upon request—are sufficiently important that we will not hold the bank liable as an initial transferee in spite of the significant control it exercises over the funds.[6] *See id.*

---

[6] Consideration of simple accounting principles supports our distinction between parties that receive funds free of any obligations—like a creditor receiving payment of a debt—and parties that receive funds subject to outstanding obligations—like a bank receiving a deposit. For example, a bank receiving funds as the payment of a debt (i.e., free of any obligations) would generally account for those funds only as an asset—an increase in cash on hand. Conversely, a bank receiving funds as a deposit (i.e., subject to outstanding obligations) would generally account for those funds as both an asset—an increase in cash on hand—and a liability—an outstanding obligation to provide funds equal to the amount of the deposit when called upon by the depositor. In either example, the bank would be free to put the money to any use it deemed advisable. But, if the mere conduit or control test focused solely on an entity's ability to put funds to use, there would be no justification for the holding in a case like *Societe Generale*, *see* 848 F.2d at 1200–02, or the distinction we draw here. Control, as the term is used in this area of the law, encompasses more than just the ability to put funds to use. *See id.* As we make clear today, a party who has nearly unlimited ability to use funds does not, for the purposes of our mere conduit or control test, "control" those funds when there exists an obligation to provide those funds to a third party.

15

These principles, when applied to the circumstances of the entire transaction before us, lead to the conclusion that the IRS, like the bank holding a deposit, cannot be held liable as an initial transferee. The record indicates that throughout 2008, the Debtor made a number of prepayments of Denson's *expected* income tax liability to the IRS. Upon receipt of those transfers, the IRS deposited the funds in the general treasury, commingled them with other government funds, and spent them—just as a bank does with deposited money. In early 2009, however, the IRS granted Denson a refund in the amount paid by the Debtor, plus interest. The refund was granted pursuant to 26 U.S.C. § 6402, which obligates the IRS to refund overpayments of tax liability.

Menotte argues that these facts show that the payment made by the Debtor was, in fact, the payment of a debt, thereby giving the IRS sufficient control over the funds to be held liable as an initial transferee. We disagree.

At no point did Denson *actually* owe income taxes for 2008. When the Debtor made the transfers to the IRS, it likely expected that Denson would accrue tax liability—otherwise, there would have been no legitimate reason for making the transfers. But, because that expectation was never realized, the IRS was always subject to the looming possibility that § 6402 would require the funds to be refunded to Denson. Thus, the IRS's rights were never as great as those held by a creditor receiving payment for a debt. Strings were always attached to the transfer,

16

and Denson metaphorically pulled those strings by requesting a refund, bringing the funds from the IRS to Denson's bank account.

We view the circumstances here as more akin to those that exist when a bank receives a deposit because the IRS's control was always subject to the obligation created by § 6402—an obligation similar to a bank's obligation to return deposited funds upon request. *See Societe Generale*, 848 F.2d at 1200–02. Not only were the obligations the same, but, as noted above, so were the rights: a bank that receives a deposit has the right to put those funds to use, just as the IRS had— and exercised—the legal right to use the funds it received from the Debtor.

Of course, there are factual differences between the circumstances in *Societe Generale* and those presently before us. First, in *Societe Generale*, we viewed the relevant transfers—one from the bank to a third party and the other from the debtor to the bank to replenish the funds the bank gave to the third party—as "virtually simultaneous." *Id.* at 1201. Here, we are faced with a nearly six month interval between the two transfers. In *Societe Generale*, however, the timing of the transfers was integral to the determination that the bank and the debtor did not enter into a debtor-creditor relationship. *See id.* Had we viewed the second transfer—from the debtor to the bank to make the bank whole—as actually and effectively occurring later in time than the first transfer, then the first transfer— from the bank to the third party on behalf of the debtor—could have been

17

characterized as a loan, and the second transfer could have been characterized as payment of a debt, in which case the bank would have the right to use the funds without any attendant obligations.  Here, however, the timing of the transfers has no impact on the IRS's rights or obligations because no matter how much time passes between the transfers, the IRS can never be conceived of as a creditor. Because the timing of the transfers does not impact the parties' legal rights and obligations, it is not a relevant factor in this case.

Similarly, the fact that the IRS, unlike the bank in *Societe Generale*, actually put the funds to use does not impact our analysis because "the control test turns on the recipient's legal rights and obligations."  *See Pony Express*, 440 F.3d at 1301. Because the IRS's use of the funds neither enlarged its rights nor reduced its obligations, its use is irrelevant to our analysis.

Finally, we note that the obligations owed by a bank to an entity making a deposit are slightly different from the obligations owed by the IRS to the Debtor or Denson.  Most importantly, neither the Debtor nor Denson had any rights in the funds until Denson's tax liability was determined, whereas an entity making a deposit into a bank account always has a right to call on those funds.  This difference, though relevant to our determination, does not require a different outcome because, again, the focus of our analysis remains on the rights and obligations of the initial recipient.  The rights held by the IRS here, like the rights

18

held by a bank that receives a deposit, were circumscribed by the obligations owed such that the transfer to the IRS could not be considered the payment of a debt. Thus, we view the transaction here as sufficiently similar to the deposit of funds into a bank account to conclude that the IRS acted as a mere conduit.

Our conclusion is both logical and equitable in that it furthers the goals of the Bankruptcy Code. Avoidance actions allow trustees to recover prepetition payments made by debtors in order to ensure that similarly situated creditors receive equal treatment. *Hartvig v. Tri-City Baptist Temple of Milwaukee, Inc. (In re Gomes)*, 219 B.R. 286, 296 (Bankr. D. Ore. 1998). Section 550 limits the entities from which a trustee may recover the value of avoidable transfers to, among others, initial transferees. 11 U.S.C. § 550(a). We have, using our equitable powers, interpreted the term "initial transferee" to exclude entities that act merely as intermediaries. *See Societe Generale*, 848 F.2d at 1201. Entities of this type have been excluded because it would be inequitable to require a party who did not receive any benefit from a transfer made by a debtor to contribute to the debtor's estate. *See id.*; *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988) (refusing to hold a bank liable as an initial transferee where it acted as an intermediary and received no benefit from the transaction). The IRS was precisely this type of party. At the time the transfer was made, the IRS gained both an asset—increased cash on hand—and a liability—an obligation

19

to refund the amount of the transfer, plus interest, if no liability accrued. To be sure, the IRS benefited from its right to use the funds in the interim, just as any bank does when a deposit is made. But, that benefit, which was offset almost entirely by the IRS's obligation to refund the amount of the transfer plus interest, is not the type of benefit an ordinary initial transferee receives. An initial transferee who receives money without an obligation to repay receives the full value of the transfer. Conversely, mere conduits—like banks receiving deposits or the IRS here—receive only the benefits that accrue between the moment the funds are received and the moment they are returned. Thus, granting the IRS mere conduit status furthers the goals of bankruptcy by forcing Menotte to recover avoidable transfers only from those parties who should rightfully be involved in the bankruptcy proceedings.

For the aforementioned reasons, we affirm the judgment of the district court.

**AFFIRMED.**