[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15585
_____

D.C. Docket No. 1:16-cv-21771-JEM

AMIR ISAIAH,
as court-appointed Receiver of Coravca
Distributions, LLC; Timeline Trading
Corp.; Edgewater Technologies, CA,
Corp.; and Edgewater Technologies, S.A.

Plaintiff – Appellant,

versus

JPMORGAN CHASE BANK, N.A.,

Defendant – Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 1, 2020)

Before ROSENBAUM and TJOFLAT, Circuit Judges, and PAULEY,[*] District Judge.

TJOFLAT, Circuit Judge:

This appeal arises out of a Ponzi scheme executed by the principals of two entities, Coravca Distributions, LLC and Timeline Trading Corp. (the "Receivership Entities").  Amir Isaiah, the court-appointed receiver for the Receivership Entities, sued JPMorgan Chase Bank, N.A. ("JPMC"), seeking to recover funds that were fraudulently diverted from the Receivership Entities' bank accounts in connection with that Ponzi scheme.  His complaint sought to avoid the fraudulent transfers and recover the diverted funds on behalf of the Receivership Entities under the Florida Uniform Fraudulent Transfer Act ("FUFTA"), and to collect damages from JPMC for JPMC's alleged aiding and abetting of three torts: breach of fiduciary duty, conversion, and fraud.  Isaiah claimed that JPMC helped facilitate the Ponzi scheme by transferring funds into, out of, and among the Receivership Entities' bank accounts, despite its alleged awareness of suspicious banking activity on those accounts.  The District Court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6), holding that Isaiah failed to allege an applicable conveyance or fraudulent transfer for purposes of his FUFTA claim, and failed to sufficiently allege that JPMC had actual knowledge of the underlying

---

[*] Honorable William H. Pauley, III, Senior United States District Judge, Southern District of New York, sitting by designation.

Ponzi scheme for purposes of his aiding and abetting claims.  After careful review, and with the benefit of oral argument, we affirm.

I.

Because this case was dismissed on a Rule 12(b)(6) motion to dismiss, we restate the following facts as alleged by Isaiah in his complaint.  A Florida state court appointed Isaiah receiver of the Receivership Entities in September 2010, after finding that the principals of the Receivership Entities, Rosa Aguirre (a/k/a Rosa Villarroel) and Diego Corado (the "Ponzi schemers"), had been using the Entities to perpetrate a Ponzi scheme against investors.  In this classic Ponzi scheme, the Ponzi schemers solicited investors by promising astronomical returns on investments supposedly involving the trade of Venezuelan and U.S. currency.  As proof that the investments were generating returns, the Ponzi schemers would send "distributions" to the investors through the Receivership Entities.  In reality, the "distributions" consisted merely of money invested by other duped investors instead of actual gains on legitimate investments.  Through this charade, the Ponzi schemers ultimately defrauded more than 2,000 investors and pilfered millions of dollars from the Receivership Entities.

The Ponzi schemers operated this fraudulent scheme, in part, by depositing investments into and making "distributions" from several JPMC bank accounts belonging to the Receivership Entities.  Until early 2010, the Receivership Entities

had only one corporate account at JPMC, and for the first twenty-eight months of their banking relationship with JPMC, the account activity was fairly normal. But in January 2010 the total amount of monthly deposits and withdrawals skyrocketed, and in February the Receivership Entities opened a second bank account at JPMC. The Receivership Entities continued to make substantial deposits into and withdrawals from these accounts in rapid succession and corresponding amounts until, in May 2010, JPMC's internal anti-money laundering section detected suspicious activity on the accounts and unilaterally closed both bank accounts. Almost immediately after JPMC detected fraud on the two accounts—indeed, less than a day after closing each account—JPMC allowed the Receivership Entities to open two new JPMC bank accounts. This, the complaint alleges, allowed the Ponzi schemers to "wind down their affairs" and transfer the funds from the Receivership Entities' JPMC accounts to new bank accounts at Bank of America and Wachovia Bank, where the Ponzi schemers continued their fraudulent scheme over the next several months.

Isaiah, now the court-appointed receiver of the Receivership Entities, filed this suit against JPMC in state court based on JPMC's handling of the Receivership Entities' accounts. He sought (1) avoidance and recovery of certain fraudulent transfers allegedly made to JPMC under the FUFTA, Fla Stat. § 726.105(1)(a), and (2) damages for JPMC's aiding and abetting the Ponzi schemers' breach of their

4

fiduciary duties, conversion of the Receivership Entities' funds, and fraud. Specifically, the complaint seeks to recover from JPMC, on behalf of the Receivership Entities, funds that were fraudulently deposited into, withdrawn from, and transferred among the Receivership Entities' bank accounts because JPMC was an "actual recipient[] of the transfers and [a] bad faith commercial conduit[]" that "acted in bad faith in processing bank transactions for and/or on behalf of the Receivership Entities." Compl. ¶ 51. As to the aiding and abetting claims, the complaint alleges that JPMC failed to follow sound banking practices and willfully ignored suspicious banking activity, and thus knowingly encouraged the Ponzi schemers' tortious conduct by providing a platform for them to carry out their illicit scheme.

JPMC removed the state-court complaint to federal court pursuant to 28 U.S.C. § 1441, and the District Court properly exercised diversity jurisdiction under 28 U.S.C. § 1332. JPMC then filed a motion to dismiss the complaint in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which the District Court granted.[1] The District Court reasoned that Isaiah's complaint failed to allege an applicable conveyance or fraudulent transfer for purposes of FUFTA liability because it alleged nothing more than routine banking activity by JPMC;

---

[1] The District Court also granted JPMC's motion to stay discovery pending resolution of the motion to dismiss.

5

the Ponzi schemers never departed with the assets in the bank accounts, but merely transferred the funds between themselves. *Isaiah v. JPMorgan Chase Bank, N.A.*, No. 16-CIV-21771-MARTINEZ, 2017 WL 5514370, at *2 (S.D. Fla. Nov. 15, 2017). The District Court also held that the complaint failed to adequately allege that JPMC had actual knowledge of the underlying tortious conduct—the Ponzi scheme—as required for aiding and abetting liability. *Id.* at *4. This appeal followed. We review the District Court's ruling on JPMC's motion to dismiss *de novo*, accepting the above allegations as true and construing them in the light most favorable to Isaiah. *See Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 942 (11th Cir. 2014).

## II.

The FUFTA provides generally that a creditor may avoid a debtor's fraudulent transfer to the extent necessary to satisfy the creditor's claim. Fla. Stat. § 726.108(1)(a). Under the FUFTA, "[a] transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 726.105(1)(a). To prevail on a fraudulent transfer claim, a creditor must demonstrate (1) there was a creditor to be defrauded, (2) a debtor intending fraud, and (3) a conveyance—i.e.,

6

a "transfer"—of property which could have been applicable to the payment of the debt due. *Wiand v. Lee*, 753 F.3d 1194, 1199–1200 (11th Cir. 2014).[2]

The FUFTA defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." Fla. Stat. § 726.102(14). While the definition of transfer is broad, the statute plainly requires a plaintiff to show that the debtor either disposed of his asset or relinquished some interest in that asset. *Nationsbank, N.A. v. Coastal Utilities, Inc.*, 814 So. 2d 1227, 1230 (Fla. Dist. Ct. App. 2002). As long as the debtor relinquishes some interest in or control over the asset a FUFTA transfer has occurred, even if he remains the technical owner of the asset. *In re Levine*, 134 F.3d 1046, 1050 (11th Cir. 1998). Accordingly, in *Levine* we held that the debtor's purchase of an annuity constituted a FUFTA transfer because, by purchasing an annuity, the debtor limited his ability to withdraw his money to the terms of the annuity contract, thereby relinquishing some interest in that money. *Id.* at 1049–50. The debtor no longer retained total control over or unfettered access to the full amount of his "property." *Id.* at 1050.

Isaiah's complaint identifies three types of banking transactions that he alleges constitute fraudulent transfers under the FUFTA: deposits into the

---

[2] Isaiah, as receiver of the Receivership Entities, has standing to pursue this clawback action on behalf of the Receivership Entities under the FUFTA. *See id.* at 1203; *see also infra* pp. 16–17.

Receivership Entities' JPMC bank accounts, withdrawals from the Receivership Entities' JPMC bank accounts, and so-called "Intercompany Transfers" among those JPMC bank accounts.  Isaiah's primary argument on appeal is that when the Ponzi schemers deposited money into the Receivership Entities' bank accounts, they "transferred" that money to JPMC within the meaning of the FUFTA.  He argues that when an accountholder deposits money into his bank account, the bank takes title to the money and then owes a debt to the accountholder, creating a debtor-creditor relationship between the accountholder and the bank.  Thus, a deposit represents the accountholder's conditional parting with his property, subject to his right to later withdraw the deposited funds.

We disagree that a routine bank deposit constitutes a transfer to the bank within the meaning of the FUFTA.  To be sure, when an accountholder deposits money into his bank account, the bank takes title to the money and has certain legal rights to put the deposited funds to its own use.  *See, e.g.*, *In re Custom Contractors, LLC*, 745 F.3d 1342, 1350 (11th Cir. 2014).  For example, banks regularly use deposited funds by distributing them to others in the form of loans.  *See id.*  But the bank's right to use those funds is subject always to its obligation to the accountholder to return the funds upon request.  *Id.*

In *Levine*, we made clear that in determining whether a FUFTA transfer occurred, the relevant inquiry is not one of ownership or title but of control.  134

F.3d at 1050. While an accountholder may transfer title of funds to the bank when he makes a routine deposit into his bank account, the accountholder can still call upon the bank to return those funds on demand, simply by initiating a withdrawal from his account. The accountholder thus never relinquishes his interest in or control over the funds deposited into his bank account; rather he "retain[s] total control over" and has "unfettered access to" the full amount of his money in his account and can withdraw those funds at will. *See id.*

As the complaint makes clear, the Ponzi schemers retained full access to and control over the funds in the Receivership Entities' JPMC bank accounts: they withdrew funds, wrote countless checks, made several purchases, and initiated wire and other transfers at will. They did not "dispos[e] of or part[] with an asset or an interest in an asset" when they deposited money into the Receivership Entities' own bank accounts. *See* Fla. Stat. § 726.102(14). Thus, they did not transfer that money to JPMC within the meaning of the FUFTA. *Accord In re Whitley*, 848 F.3d 205, 208–10 (4th Cir. 2017) (holding that regular deposits into a customer's unrestricted bank account did not constitute transfers to the bank under § 101(54) of the Bankruptcy Code, which defines a "transfer" in substantially similar terms as the FUFTA).[3] Isaiah's allegations regarding routine deposits into the

---

[3] This is not to say that banks may never be held liable as the recipient of a fraudulent transfer under the FUFTA. In the analogous bankruptcy context, we have acknowledged that a bank can be held liable as the recipient, or "initial transferee," of a fraudulent transfer under the

9

Receivership Entities' own bank accounts are thus insufficient to state a FUFTA claim against JPMC.

As a fallback, Isaiah argues that the complaint adequately alleges that the Ponzi schemers relinquished dominion and control over the funds in the Receivership Entities' bank accounts when they withdrew money from those accounts and transferred those funds to *third-party* accounts at JPMC. But we can find no such allegation in Isaiah's complaint. The complaint alleges generally that the Ponzi schemers withdrew money and made other wire transfers, and that the Ponzi schemers made payments to certain unidentified "Group Leaders" who contributed to the scheme. Compl. ¶¶ 21–26, 38. But it contains no allegation that those Group Leaders—or any other third party, for that matter—deposited funds received from the Receivership Entities into bank accounts *at JPMC*. And the nearly 100 pages of exhibits appended to the complaint—spreadsheets detailing the activity on the Receivership Entities' JPMC bank accounts—show only the

---

Bankruptcy Code—which provides for the avoidance of fraudulent transfers in substantially similar terms as the FUFTA—if it received the funds as payment of an existing debt, such as a mortgage payment, or as compensation for services rendered. *See Custom Contractors*, 745 F.3d at 1350 (explaining that, when the transferor transfers money to the bank in payment of a debt, he retains no rights to the funds and the bank receives the money with "no strings attached"); *In re Pony Express Delivery Servs., Inc.*, 440 F.3d 1296, 1301 (11th Cir. 2006) (explaining that while banks do not ordinarily exercise legal control over funds deposited in their clients' bank accounts, when a bank receives assets from a debtor as payment of a genuine debt, those assets "immediately become [the bank's] own assets and are not simply held for its client's purposes"); *In re Chase & Sanborn Corp.*, 904 F.2d 588, 599–600 (11th Cir. 1990) (finding a bank to be the initial transferee of a fraudulent transfer where the funds were transferred to the bank to pay off part of a loan).

movement of money into, out of, and among the Receivership Entities' own bank accounts. Put simply, there is no allegation that money was transferred from the Receivership Entities' bank accounts into any other JPMC accounts except their own.[4] Because Isaiah's FUFTA claims against JPMC are based only on the Receivership Entities' movement of funds into and among their own bank accounts, the District Court correctly determined that the complaint failed to allege a fraudulent transfer to JPMC within the meaning of the FUFTA.[5]

Finally, Isaiah argues that the District Court erred by applying a bright-line rule that a defendant can avoid FUFTA liability solely by showing that it lacked control over the funds at issue, and without any consideration of the defendant's good faith. In so arguing, Isaiah apparently construes the District Court's opinion as holding that JPMC was entitled to avail itself of the "mere conduit" affirmative defense. The mere conduit defense allows defendants to avoid liability as the recipient of a fraudulent transfer if they can show "(1) that they did not have

---

[4] Even if the complaint could be construed to contain such an allegation, we doubt that the mere movement of money into a third party's bank account at JPMC, without more, *see supra* note 3, would be enough to establish FUFTA liability against *JPMC* as opposed to the third party accountholder. As explained above, the routine deposit of money into an unrestricted bank account does not constitute a transfer to the bank within the meaning of the FUFTA. So, any transfer that the Receivership Entities made to a third-party bank account at JPMC would likely constitute a transfer to the third party that owns the account, not to JPMC.

[5] Put differently, because the Receivership Entities at all times retained access to and control over the funds in their own bank accounts, the Entities have not suffered any loss to be recouped in a clawback action under the FUFTA.

11

control over the assets received, i.e., that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor *and* (2) that they acted in good faith and as an innocent participant in the fraudulent transfer." *In re Harwell*, 628 F.3d 1312, 1323 (11th Cir. 2010) (emphasis in original). To be clear, the District Court did not apply the mere conduit defense in dismissing Isaiah's FUFTA claim, and neither do we. Rather, the District Court did not need to reach that question because it held, as we do here, that Isaiah failed to allege any applicable FUFTA transfer and so, as a threshold matter, failed to even state a FUFTA claim. To illustrate why we have no need to reach the issue that Isaiah prompts us to address, we pause here to briefly explain the differences between our holding and the application of the mere conduit defense. Though the inquiries may be semantically similar, they are conceptually distinct.

First, the mere conduit defense is an affirmative defense that must be proved by the defendant seeking its protection. A complaint need not anticipate and negate affirmative defenses and should not ordinarily be dismissed based on an affirmative defense unless the defense is apparent on the face of the complaint. *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (citing *Jones v. Bock*, 549 U.S. 199, 215, 127 S. Ct. 910, 921 (2007)).

Second, although the mere conduit defense, like the question whether a FUFTA transfer has occurred, requires us to ask whether a particular party had

12

legal control over the assets allegedly transferred, the two concepts involve slightly different inquiries.  To establish that a FUFTA transfer occurred, a plaintiff must show that the debtor *relinquished* control over the property such that he can be said to have disposed of or parted with an interest in it.  *See* Fla. Stat. § 726.102(14).  For a defendant to avail itself of the mere conduit defense, it must show that it did not *gain* sufficient legal control over the property disposed of by the debtor such that it should be held liable as a recipient of that fraudulently transferred property.  *See, e.g.*, *Harwell*, 628 F.3d at 1323.  In other words, the mere conduit defense presupposes that a transfer has occurred—that the debtor has disposed of or parted with an interest in some asset—and asks whether the defendant was the true recipient of the transferred asset.

Third, and perhaps most importantly, the mere conduit affirmative defense is a judicially created exception grounded in the equitable powers of the bankruptcy courts.  *Id.* at 1322.  It arose not under FUFTA, but in the context of an analogous fraudulent transfer provision in the Bankruptcy Code, which allows a bankruptcy trustee to avoid certain fraudulent transfers similar to those avoidable under the FUFTA and to recover the value of the transfers from the "initial transferee of such transfer."  *See* 11 U.S.C. §§ 548(a)(1), 550(a)(1).  Recognizing the inequity that would result if the court adopted a literal interpretation of the term "initial

transferee,"[6] we crafted this equitable exception to exclude mere conduits or intermediaries who might otherwise be deemed "initial transferees" from being held liable for funds they never actually controlled or benefitted from. *Custom Contractors*, 745 F.3d at 1349, 1352; *Harwell*, 628 F.3d at 1322.

Neither this Circuit nor the Florida courts have decided whether this equitable defense should also apply in statutory actions under FUFTA, and for the reasons set forth above we need not decide that question either. Nor must we decide whether JPMC would be entitled to the mere conduit affirmative defense if it did apply. Because Isaiah's complaint fails to allege an applicable FUFTA transfer, his complaint fails, as an initial matter, to state a claim of FUFTA liability. The District Court therefore did not err in dismissing his complaint under Rule 12(b)(6) on that basis.

III.

The District Court also dismissed Isaiah's aiding and abetting claims against JPMC because it found that the complaint did not adequately allege that JPMC had actual knowledge of the underlying Ponzi scheme to support his claims that JPMC aided and abetted the Ponzi schemers' torts. *Isaiah*, 2017 WL 5514370, at \*4. At oral argument, we raised the additional concern that because Isaiah, as receiver of

---

[6] The Bankruptcy Code does not define the term "transferee" and there is no legislative history on the term. *Harwell*, 628 F.3d at 1317 (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).

the Receivership Entities, stands in the shoes of those Entities, and because the Entities are in turn tarred by the fraudulent acts of the Ponzi schemers, Isaiah could not bring tort claims against JPMC for aiding and abetting the Receivership Entities' own torts.  We asked the parties to file supplemental letter briefs addressing whether the fraudulent acts of the Receivership Entities, as the principals of the Ponzi scheme, are imputed to Isaiah for purposes of his tort claims under Florida law.  We find that they are, and thus that Isaiah lacks standing to bring these aiding and abetting claims against JPMC.[7]

It is axiomatic that a receiver obtains only the rights of action and remedies that were possessed by the person or corporation in receivership.  *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 550 (Fla. Dist. Ct. App. 2003).  Although a receivership is typically created to protect the rights of creditors, the receiver is not the class representative for creditors and cannot pursue claims owned directly by the creditors.  *Id.*  Rather, he is limited to bringing only those actions previously owned by the party in receivership.  *Id.*  For purposes of this appeal, then, we must determine whether the Receivership Entities would have had a claim against JPMC for aiding and abetting the Ponzi scheme executed through the Receivership

---

[7] "We can affirm on any basis supported by the record, regardless of whether the district court decided the case on that basis." *Martin v. United States*, 949 F.3d 662, 667 (11th Cir. 2020).

15

Entities.  That question in turn depends on whether the Ponzi schemers' fraudulent acts are imputed to the Receivership Entities.

Florida's Second District Court of Appeal addressed this exact question in *Freeman v. Dean Witter Reynolds*.  In that case, the court explained that while a receiver receives his claims from the entities in receivership, he "does not always inherit the sins of his predecessor." *Id.*  There are certain circumstances in which defenses such as unclean hands or *in pari delicto* would not apply to claims brought by a receiver, even if they would have applied against the entity in receivership. *Id.*  The court differentiated between two types of cases.  On the one hand, "there are actions that the corporation, which has been 'cleansed' through receivership, may bring directly against the principals or the recipients of fraudulent transfers of corporate funds to recover assets rightfully belonging to the corporation and taken prior to the receivership." *Id.* at 551.  We addressed these types of actions in *Wiand v. Lee*.  There, we explained that even where a corporation is operated by a Ponzi schemer, it is still in the eyes of the law a separate legal entity with rights and duties. *Wiand*, 753 F.3d at 1202 (quoting *Scholes v. Lehmann,* 56 F.3d 750, 754 (7th Cir. 1995)).  The money it receives from investors should be used for the corporation's stated purpose, and so when assets are transferred for an unauthorized purpose to the detriment of the defrauded investors, who are tort creditors of the corporation, the corporation itself is harmed.

16

*Id.* Although the corporation may have participated in the fraudulent transfers prior to receivership, once the individual tortfeasor is removed and a receiver is appointed, the corporation becomes entitled to the return of its assets that had been diverted for unauthorized purposes, e.g., to perpetrate a Ponzi scheme. *Id.* For that reason, we held that the receiver for the corporation has standing to sue the recipients of fraudulent transfers under the FUFTA. *Id.* at 1203.

On the other hand, however, are common law tort claims against third parties to recover damages for the fraud perpetrated by the corporation's own insiders. *See Freeman*, 865 So. 2d at 551. With respect to these claims, *Freeman* held that unless the corporation in receivership has at least one honest member of the board of directors or an innocent stockholder, the fraud and intentional torts of the insiders cannot be separated from those of the corporation itself and the corporation cannot be said to be an entity separate and distinct from the individual tortfeasors. *Id.* The corporation—and the receiver who stands in the shoes of the corporation—lacks standing to pursue such tort claims because the corporation, "whose primary existence was as a perpetrator of the Ponzi scheme, cannot be said to have suffered injury from the scheme it perpetrated." *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1203 (11th Cir. 2003).[8] *Freeman* thus

---

[8] *O'Halloran* was a bankruptcy case in which the bankrupt entity had operated a vast Ponzi scheme. The trustee of the bankrupt entity, along with two individual investors who were defrauded by the Ponzi scheme, sued the bank at which the entity maintained some of its bank

17

distinguished "between an honest corporation with rogue employees, which can pursue claims for the fraud or intentional torts of third parties while in receivership, and a sham corporation created as the centerpiece of a Ponzi scheme, which cannot pursue such claims." 865 So. 2d at 552.

Applying these legal principles, the court in *Freeman* found that the receiver lacked standing to pursue aiding and abetting claims against third parties because the entity in receivership itself could not pursue those claims:

> [The entity] was controlled exclusively by persons engaging in its fraudulent scheme and benefitting from it. [It] was not a large corporation with an honest board of directors and multiple shareholders, suffering from the criminal acts of a few rogue employees in a regional office. It is clear from the allegations of the amended complaint that it was created by the Grazianos to dupe the customers. This corporation was entirely the robot or the evil zombie of the corporate insiders.

*Id.* at 551. As such, it was not the corporation but the individual customers who suffered injury as a result of the Ponzi scheme, and who may have rights to pursue

---

accounts for aiding and abetting certain crimes and torts, assisting in the breach of fiduciary duties, breaching its own duties to warn and to control, and negligence. *Id.* at 1200–01. We agreed with the trustee that he lacked standing to bring any claims against the bank related to the Ponzi scheme because based on the allegations of the complaint, which described the entity as an organization whose sole purpose was to perpetrate a Ponzi scheme, the entity was one of the principal culprits in the Ponzi scheme, and so neither the entity nor the trustee in bankruptcy could sue for the Ponzi-scheme-related torts. *Id.* at 1202–03 (citing 11 U.S.C. §§ 541–42) ("A bankruptcy trustee stands in the shoes of the debtor and has standing to bring any suit that the debtor could have instituted had it not been thrown into bankruptcy."). But we held that the trustee did have standing to pursue claims against the bank arising from the alleged embezzlement of funds from the entity's bank account. *Id.* at 1204. As the holder of voidable title to the funds in its bank account, the entity could have been legally injured when one of its officers wrongfully embezzled money from the entity's accounts. *Id.*

18

claims against third parties that allegedly aided and abetted that scheme. *Id.* at 553.

This case is indistinguishable from *Freeman*. Isaiah's complaint depicts the Receivership Entities as the robotic tools of the Ponzi schemers, alleging that the Ponzi schemers "asserted complete control over the Receivership Entities in operating the Ponzi Scheme and improperly diverting funds from the bank accounts of the Receivership Entities." Compl. ¶ 20. The complaint itself shows that the Receivership Entities were wholly dominated by persons engaged in wrongdoing and is devoid of any allegation that the Receivership Entities engaged in any legitimate activities or had "at least one honest member of the board of directors or an innocent stockholder" such that the fraudulent acts of its principals, the Ponzi schemers, should not be imputed to the Entities themselves. *Freeman*, 865 So. 2d at 551. At least on the basis of this complaint, the Ponzi schemers' torts cannot properly be separated from the Receivership Entities, and the Receivership Entities cannot be said to have suffered any injury from the Ponzi scheme that the Entities themselves perpetrated. As in *Freeman*, any claims for aiding and abetting the torts of the Receivership Entities' corporate insiders belong to the investors who suffered losses from this Ponzi scheme, not the Receivership Entities. The Receivership Entities thus cannot assert tort claims against third parties like JPMC for aiding and abetting the Ponzi scheme. Because Isaiah, as

receiver, stands in the shoes of the Receivership Entities, he too lacks standing to bring these aiding and abetting claims against JPMC.

Contrary to Isaiah's contention, our holding is entirely consistent with the state court's order appointing Isaiah receiver of the Receivership Entities. The state court order "specifically authorized and empowered [Isaiah] to file suit against any person(s) or entity(s) [sic] to recover property of the Receivership Entities including, but not limited to, fraudulent conveyances and other claims and causes of actions [sic] *otherwise belonging to the Receivership Entities*." Compl. Ex. 1 at 8 (emphasis added). The receivership order makes clear that Isaiah may bring only those claims that would otherwise belong to the Receivership Entities. As we have explained, any claims for aiding and abetting the Ponzi scheme do not belong to the Receivership Entities; they belong to the defrauded investors, whom Isaiah does not represent.

In sum, we hold that Isaiah lacks standing to assert, on behalf of the Receivership Entities, claims against JPMC for allegedly aiding and abetting the Ponzi schemers' breach of fiduciary duties, conversion, and fraud. Like in *Freeman*, Isaiah's ability to pursue these claims is barred not by the doctrine of *in pari delicto*, but by the fact that the Receivership Entities were controlled exclusively by persons engaging in and benefitting from the Ponzi scheme, and so the Receivership Entities were not injured by that scheme. 865 So. 2d at 550–51.

20

In the absence of any allegation in the complaint that the Receivership Entities had at least one innocent officer or director and were thus honest corporations injured by the actions of a few corrupt employees, the Receivership Entities—and in turn, Isaiah—lack standing to pursue claims against JPMC for aiding and abetting the Ponzi scheme.[9]

## IV.

Finally, we note that the District Court did not abuse its discretion in staying discovery pending resolution of JPMC's motion to dismiss. We review a district court's decision to stay discovery for an abuse of discretion. *See Patterson v. U.S. Postal Serv.*, 901 F.2d 927, 929 (11th Cir. 1990). A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, or follows improper procedures in making its decision. *Kolawole v. Sellers*, 863 F.3d 1361, 1366 (11th Cir. 2017).

---

[9] The District Court dismissed Isaiah's complaint with prejudice without first giving Isaiah a chance to amend his complaint to properly state a claim. We have held that "[a] district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc) (overruling our precedent requiring that a plaintiff be given at least one chance to amend his complaint before the district court dismisses the action with prejudice). Isaiah, who is represented by counsel, never moved or otherwise sought leave to amend his complaint below. To the contrary, he has maintained throughout that his complaint is sufficient as it presently stands. Only after we ordered supplemental briefing on the standing issue did Isaiah suggest that he should be permitted to amend his complaint to assert additional facts to avoid dismissal. For that reason, we cannot say that the District Court erred in dismissing his complaint with prejudice.

21

"Facial challenges to the legal sufficiency of a claim or defense, such as a motion to dismiss based on failure to state a claim for relief, should . . . be resolved before discovery begins." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997). Indeed, the failure to consider and rule on these potentially dispositive pretrial motions can be an abuse of discretion. *Id.* In determining whether JPMC's motion to dismiss was likely to be dispositive of this case, the District Court had the benefit of a previous court's review of Isaiah's nearly identical claims against a different bank. In that previous suit, the state court dismissed Isaiah's complaint against another bank that alleged virtually the same claims based on similar facts. *See Isaiah v. Wells Fargo Bank, N.A.*, No. 14-15246-CA-40, 2015 WL 7912778 (Fla. Cir. Ct. Feb. 6, 2015). The District Court therefore did not abuse its discretion in staying discovery pending resolution of JPMC's 12(b)(6) motion to dismiss challenging the legal sufficiency of Isaiah's claims.

## V.

The vice in this case is that even if Isaiah ended up recovering damages in his suit against JPMC, the defrauded investors—the individuals actually injured by the Ponzi scheme—would be no better off. As the state court's order and the filings made in support of that order make clear, Isaiah has never represented the defrauded investors. Rather, it has always been understood that Isaiah's role as

22

receiver is to protect the Receivership Entities' assets, which consist of "investments" made by the Ponzi scheme victims, from being dissipated by the Ponzi schemers.

Indeed, the defrauded investors who sought the appointment of a receiver in this case asked the state court in their complaint to appoint Isaiah receiver "for the property, assets, and business [of] all Defendants named herein," including the Receivership Entities and the individual Ponzi schemers, to "receive, preserve, and protect" those assets. Emergency Compl. at 15, *P & M Bus. Sys., Corp. v. Coravca Distributions, LLC*, No. 10-49586-CA-40 (Fla. Cir. Ct. Sept. 13, 2010). They likewise explained in their motion filed along with the complaint that they sought "the appointment of a Receiver and injunctive relief to prevent [the] Defendants . . . and any of their agents, from continuing to engage in the deceptive practices as alleged" in the complaint. Pls.' Emergency Ex-Parte Mot. for Appointment of Receiver and Inj. Relief Without Notice at 1, *P & M Bus. Sys., Corp. v. Coravca Distributions, LLC*, No. 10-49586-CA-40 (Fla. Cir. Ct. Sept. 13, 2010). Moreover, in their brief in support of that motion, the investor-plaintiffs recognized that "a temporary receiver is appointed only to preserve the property and to protect the rights of all parties therein," i.e., to protect the investor-plaintiffs' rights to the funds swindled from them by the Ponzi schemers and currently in the hands of the Receivership Entities. Mem. of Law in Supp. of Pls.'

23

Emergency Ex Parte Mot. for the Appointment of Receiver and Inj. Relief Without Notice at 5, *P & M Bus. Sys., Corp. v. Coravca Distributions, LLC*, No. 10-49586-CA-40 (Fla. Cir. Ct. Sept. 13, 2010).

Consistent with these filings, the state court appointed Isaiah receiver of the Receivership Entities "to protect the assets of [the Receivership Entities] . . . from being sold, transferred, alienated or otherwise dissipated until the resolution of the instant [state court] proceeding." Isaiah Compl. Ex. 1 at 3. For that purpose, the receivership order provided that "[t]he Receiver shall marshal, preserve, protect, maintain, manage and safeguard the [Receivership Entities'] Property in a reasonable, prudent, diligent, and efficient manner." *Id.* at 6. In other words, the receivership order imposed an obligation on Isaiah to collect and preserve the assets of the Receivership Entities to prevent dissipation of those assets by the Ponzi schemers.

While collecting damages from third parties may indirectly benefit the defrauded investors and other creditors of the Receivership Entities—e.g., by enlarging the "pie" from which the creditors may ultimately recover—the receiver does not pursue such actions *on behalf of* the creditors because he does not represent those creditors. In fact, the receivership order contemplates that any creditors of the Receivership Entities would have to file claims against the Entities—i.e., against Isaiah—in order to secure their slice of the pie. *See id.* at 8

24

(providing that "[t]he Receiver shall establish a procedure for creditors of the Receivership Entities to file claims").  And by the terms of the receivership order, Isaiah does not simply turn over the funds he collects to the Entities' creditors, but instead must "examine the validity and priority of all claims against the Receivership Entities, which claims shall be finally determined by th[e] Court." *Id.*  Thus, any money that Isaiah may recover in this lawsuit is not really money in the creditors' pockets, but instead is the property of the Receivership Entities. Whether or not the investors receive any of that money will depend on the outcome of additional proceedings that they must initiate against the Receivership Entities.[10]

To allow receivers to bring these types of lawsuits purportedly for the benefit of the entities' creditors is really to usurp the claims that properly belong to those creditors.  And while the receiver continues to litigate these claims in his own suit, the statute of limitations may be running on those claims that the creditors actually possess and for which, if enough time has passed, they may lose the ability to recover.

*    *    *

---

[10] Not only would Isaiah be pitted against some of the investors or creditors in this sense, but the investors themselves may also be pitted against one another or, at the very least, may have interests adverse to one another.  After all, not all investors lost money in this scheme; at least some of the investors earned a profit on their initial investment.  A review of the state court docket in this case reveals that Isaiah has in fact filed unjust enrichment and restitution claims against certain investors who were net-winners in the Ponzi scheme, alleging that they received an unfair benefit at the expense of other defrauded investors.  *See, e.g.*, Compl., *Isaiah v. High Quality Finish Carpentry Corp.*, No. 13-031130-CA-01 (Fla. Cir. Ct. Sept. 30, 2013).

With that final thought, the District Court's orders staying discovery and granting JPMC's Rule 12(b)(6) motion to dismiss are

**AFFIRMED.**